[Cite as *State v. Lindsey*, 2019-Ohio-782.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106111**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**DONNELL D. LINDSEY**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-602687-B

**BEFORE:** Keough, J., S. Gallagher, P.J., and Jones, J.

**RELEASED AND JOURNALIZED:** March 7, 2019

**ATTORNEY FOR APPELLANT**

Myriam A. Miranda
P.O. Box 40222
Bay Village, Ohio 44140


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Anna M. Faraglia
       Christopher D. Schroeder
Assistant Prosecuting Attorneys
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Donnell Lindsey ("Lindsey"), appeals his convictions. Finding no merit to the appeal, we affirm.

{¶2} In June 2016, Lindsey was charged with the shooting death of three-year old Major Howard. The 24-count indictment charged him with aggravated murder (Counts 1 and 2), murder (Count 3), felonious assault (Counts 4, 5, 7, 8, 10, 11, 13, 14, and 16), attempted murder (Counts 6, 9, 12, and 15), discharge of a firearm on or near prohibited premises (Count 17), improperly discharging a firearm at or into a habitation or school (Counts 18, 19, 20), improperly handling a firearm in a motor vehicle (Count 21), having weapons while under disability (Count 22), tampering with evidence (Count 23), and arson (Count 24). Most of the counts contained one-, three-, and five-year firearm specifications. Lindsey pleaded not guilty and ultimately was tried before a jury, except the weapons under disability charge, which was tried to the bench.

{¶3} The following evidence was presented to the jury. In the mid-evening on September 15, 2015, Rob'Dasha Smith ("Smith") drove Brittany Anderson ("Anderson") to East 113th Street in Cleveland to meet friends. Anderson's three-year-old son, Major Howard, accompanied them. Once they arrived on East 113th, Smith parked her car on the east side of the street facing north. Anderson got out of the car and met up with her boyfriend, Dexter Mangham ("Mangham"), and they started walking up the street. Smith ultimately stayed in the car with Major. Smith said she was sitting in the front seat, and Major was standing on her lap facing her.

{¶4} Anderson testified that she was walking on the sidewalk when she saw a white four-door Toyota traveling north on East 113th Street from Union Avenue toward Regalia Avenue at a high rate of speed. As the vehicle approached, she saw a dark-skinned man wearing a gray hoodie with the hood on his head, shooting from the passenger's side of the vehicle. Mangham ran away, and Anderson ran up a driveway.

{¶5} At the time of the shooting, Mary Mell, a resident of East 113th Street, was washing her car outside with her son, Robert Mell. She testified that she heard gunfire and ran into the garage. Robert also ran into the garage and watched a four-door vehicle drive by with sparks erupting from the window. Robert testified that although he partially closed the garage door, he saw his neighbor from across the street, Nate Wiggins, shooting from the street in the direction of Regalia Avenue.

{¶6} Shots were fired from multiple locations as the car advanced through the block and bullets struck the homes of both Mary Mell and her next-door neighbor, Myrtle Mell. Cleve Johnson, another resident of East 113th, testified that he was home with his elderly mother when bullets entered his home and struck the refrigerator.

{¶7} Once the gunfire ceased, Smith opened the car door and stated that both she and Major had been shot. Kevin Nance ("Nance"), a resident of East 113th, drove Anderson, Major, and Smith to the Cleveland Clinic. Robert Scott ("Scott"), another East 113th resident, rode along and administered aid to the wounded child. Major subsequently passed away from a gunshot wound to the right side of his chest.

{¶8} The following day, on September 16, 2015, the police received a call to investigate a car fire in the area of East 102nd Street. The car was a white Toyota Yaris that was rented by James Konopinski ("Konopinski") on September 11, four days before the East 113th shooting. He was subsequently interviewed, and told police that he was a drug addict and that his drug supplier, Lindsey, asked him to rent the vehicle and loan it to him for the week in exchange for drugs. Cell phone records showed that Lindsey called Konopinski several times following the shooting. Konopinski told police that on the night of the shooting, Lindsey told him that he needed to report that the vehicle was stolen.

{¶9} Cell phone records showed that Lindsey called Konopinski the following morning, minutes before a passerby found the vehicle burning in an abandoned garage. Konopinski testified that Lindsey told him that morning that "it was all taken care of." It was determined that the cause of the car fire was arson and the fire likely started in the front passenger area of vehicle, where Lindsey was seen seated and shooting from the vehicle.

{¶10} Devon Long testified for the defense that he borrowed a white vehicle from Lindsey. However, he could not recall the make or model of the vehicle.

{¶11} Based on the information received from Konopinski, Lindsey became a suspect for the shooting that occurred on East 113th and the murder of Major Howard. On September 20, 2015, an arrest warrant was issued. That night, the news media broadcasted a story that a

warrant had been issued for Lindsey and displayed his photograph. Lindsey was not arrested until May 2016, when he was apprehended in Atlanta, Georgia.

{¶12} Detective Kathleen Carlin testified that based on the information received from Konopinski, a photo array was compiled for Anderson to view during her interview with police on September 21, 2015.

{¶13} Unbeknownst to the police, Anderson saw a news broadcast the day before her scheduled interview that identified Lindsey as a suspect in the shooting and showed a photograph of Lindsey. It was the same picture that the police used in the photo array presented to Anderson. She identified Lindsey as the person who murdered her son. Anderson told the jury that she saw Lindsey's picture on television, but that she recognized him from the street and not from seeing him on the television.

{¶14} Scott was also a witness to the shooting. He testified that he lived on East 113th Street and prior to the shooting, he saw Mangham with a Glock firearm. Immediately before the shooting, he was outside sitting on his porch, but when he heard gunshots, he laid on the porch floor. He stated that he heard Anderson's calls for help that her son had been shot. Scott testified that he and Nance rendered aid to and transported Major to the hospital. He was interviewed by police later that evening and the following day. He denied seeing any of the shooters but stated that he saw a white four-door vehicle.

{¶15} On January 7, 2016, Scott, wanting to act as a confidential informant, told detectives that he saw Lindsey, who he knew as "Nell," shooting from the white car. He also indicated that he saw "A.D.," later identified as Aaron Dunnings ("Dunnings"), in the car. He was shown a photo array and was asked if he recognized anyone. He identified Lindsey as someone he knew from East 93rd who was shooting from the car on September 15, and

Dunnings as a person who he knew from growing up and who may have been shooting from the car on September 15.

{¶16} Some time between January 7, 2016 and February 6, 2017, Scott's story changed, and he stated that he did not know who did the shooting. Between that time, Scott was convicted and sentenced to prison on an unrelated felonious assault charge. The state insinuated that Scott's story changed only after one of Lindsey's defense attorneys visited him in prison and offered to connect him with the witness protection program. Scott denied that he felt intimidated or pressured to change his story, but that that he was "just trying to help Major. I'm Major's voice right now" (tr. 1984) and that he got his information from people that "should have stood up, but they didn't." (Tr. 2001.) Scott admitted that he put his life in danger by rendering aid to Major, speaking to the media immediately following the shooting, and testifying at trial.

{¶17} Detective Brian Stockwell ("Detective Stockwell") of the Cleveland Division of Police Gang Impact Unit, testified about gang activity in the area of the shooting. According to Detective Stockwell, the Murdablock Gang and The Benham Boys were feuding in September 2015. Another gang, the East 93rd and Marah Gang, was an ally of Murdablock. He stated that Anderson's boyfriend, Mangham, was a member of The Benham Boys and was at odds with a member of Murdablock. According to Detective Stockwell, Lindsey was affiliated with the East 93rd and Marah Gang. On September 27, 2015, Mangham was murdered outside a bar on East 4th Street in Cleveland. According to Detective Stockwell, it was suspected that a member of Murdablock was responsible for Mangham's murder.

**{¶18}** Detective Al Johnson ("Detective Johnson") also testified about gang affiliations and street code. He stated that Mangham was responsible for shooting and severely injuring Lindsey's friend Darnell Hudson.

**{¶19}** Following the state's case, Lindsey moved for a Crim.R. 29 judgment of acquittal. The trial court granted the motion with respect to Counts 10 and 13, both charging felonious assault. Lindsey renewed his Crim.R. 29 motion following the presentment of his case; it was denied in its entirety.

**{¶20}** After ten days of trial, the jury found Lindsey not guilty of both counts of aggravated murder (Counts 1 and 2), but guilty of murder as charged in Count 3, and all the remaining counts, including any attendant specifications. The trial court also found Lindsey guilty of Count 22, having weapons while under disability. Lindsey was sentenced to a total prison term of 37 years to life.

**{¶21}** This appeal followed, and Lindsey raises nine assignments of error for our review.

## I. Psychological Evaluation

**{¶22}** On the day of trial, defense counsel informed the court that Lindsey wished to discharge counsel and proceed with new counsel whom he had allegedly retained. Lindsey advised the court that he was dissatisfied with his three-person team of attorneys because he wanted a psychological evaluation to determine if he was competent to stand trial. He advised the court that he was diagnosed in 2010 with depression and post-traumatic stress disorder. Lindsey further stated that in 2011, he was diagnosed with a brain lesion in his frontal lobe, which caused him to have a lack of energy, episodes of falling asleep, and memory problems. He stated he was diagnosed as being "emotionally disturbed."

{¶23} Defense counsel admitted that Lindsey indicated that he had a brain lesion and PTSD, but counsel proceeded to prepare for trial as if Lindsey were competent to stand trial. Counsel advised the court that he believed Lindsey was competent and that Lindsey understood the nature of the offenses against him. Because the defendant put his mental state into question, and in an abundance of caution, the state requested that Lindsey be evaluated pursuant to R.C. 2945.37(B).

{¶24} Following an in-depth inquiry with Lindsey regarding his request for a psychological evaluation and to discharge his attorneys, the trial court denied both Lindsey's and the state's request for a psychological evaluation. The trial court stated that it had reviewed a prior presentence investigation report and noted that the report did not reflect that Lindsey suffered from any mental deficiency that would render him incompetent to stand trial.

{¶25} In his first assignment of error, Lindsey contends that the trial court violated his rights when it denied his oral request and the state's oral motion for a psychological evaluation.

{¶26} R.C. 2945.37(B) states that any party, including the court, may raise the issue of the defendant's competence to stand trial and, if so, the court, pursuant to R.C. 2945.371(A), may order an evaluation of the defendant's competency. "If the issue is raised before trial has commenced, the court shall hold a hearing on the issue." *Id.* R.C. 2945.37(G) provides:

> A defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code.

**{¶27}** A failure to hold a mandatory competency hearing is harmless error where the record fails to reveal sufficient indicia of incompetency. *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986). The right to a competency hearing only rises to the level of a constitutional guarantee where the record contains sufficient indicia of incompetency, such that inquiry into competency is necessary to ensure a defendant's right to a fair trial. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 64; *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 24 (trial court afforded great degree of deference on whether to conduct a competency hearing, because the trial court "see[s] and hear[s] what goes on in the courtroom").

**{¶28}** The test for determining whether a defendant is competent to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as a factual understanding of the proceedings against him. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 45. A court shall not find a defendant incompetent to stand trial solely because the defendant is receiving or has received treatment for mental illness. R.C. 2945.37(F). Even if the defendant is mentally ill, he may be legally competent to stand trial. *State v. Berry*, 72 Ohio St.3d 354, 650 N.E.2d 433 (1995), syllabus.

**{¶29}** A review of the entire record reveals that trial court routinely explained to Lindsey the status of his case following all pretrials. At no time did Lindsey indicate that he did not understand the nature of the proceedings. Additionally, the trial court consistently afforded Lindsey an opportunity to ask questions and to speak with his counsel. At no point prior to the day of trial did Lindsey ever independently or through counsel request a psychological evaluation or demonstrate any indicia of incompetency or lack of understanding that would warrant the

court to be on notice of any competency issues. Finally, defense counsel never expressed a concern about Lindsey's competency prior to trial or even when Lindsey raised the issue of competency.

**{¶30}** Accordingly, the trial court did not abuse its discretion when it found that Lindsey did not demonstrate sufficient indicia of incompetency to require a psychological evaluation and subsequent competency hearing.

**{¶31}** The first assignment of error is overruled.

## II. Retained Counsel

**{¶32}** Lindsey contends in his second assignment of error that the trial court erred when it denied him his constitutional right to retained counsel.

**{¶33}** The right to counsel of one's choice is an essential element of the Sixth Amendment right to have the assistance of counsel for one's defense. *State v. Keenan*, 8th Dist. Cuyahoga No. 89554, 2008-Ohio-807. The right is not absolute, however, and courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Thus, "[w]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate * * * rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* Furthermore, the Sixth Amendment does not guarantee "rapport" or a "meaningful relationship" between client and counsel. *State v. Henness*, 79 Ohio St.3d 53, 65, 679 N.E.2d 686 (1997), citing *Morris v. Slappy*, 461 U.S. 1, 13-14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

{¶34} Thus, "[a] defendant has only a presumptive right to employ his own chosen counsel." *State v. Keenan*, 81 Ohio St.3d 133, 137, 689 N.E.2d 929 (1998). Factors to consider in deciding whether a trial court erred in denying a defendant's motion to substitute counsel include "the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense." *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir.1996). In addition, courts should "balance * * * the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *Id.*

{¶35} Further, when the timing of a request for new counsel is an issue, a trial court may decide whether the appellant's request for new counsel was made in bad faith. *State v. Graves*, 9th Dist. Lorain No. 98CA007029, 1999 Ohio App. LEXIS 5992 (Dec. 15, 1999). A motion for new counsel made on the day of trial "intimates such motion is made in bad faith for the purposes of delay." *State v. Haberek*, 47 Ohio App.3d 35, 41, 546 N.E.2d 1361 (8th Dist.1988). Therefore, decisions relating to the substitution of counsel are within the sound discretion of the trial court. *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

{¶36} In this case, the record reveals that Lindsey's oral motion to disqualify counsel was based on (1) he did not trust his attorneys; (2) counsel did not seek a change of venue; (3) he wanted a psychological evaluation; and (4) he was not prepared to go forward with trial. Lindsey stated to the court that he felt "this way" about his attorneys for the past month, and that his family retained another attorney. Despite these assertions, he could not tell the court the identity of the "retained attorney." Lindsey's attorneys advised the court that they were made aware of Lindsey's request and dissatisfaction "this morning." (Tr. 468.)

**{¶37}** After hearing from both Lindsey and the state, the trial court took Lindsey's request under advisement. Following a recess, the trial court denied Lindsey's motion to disqualify counsel, stating that it considered the history of the case, the timing of the request, and the discussion with Lindsey.

**{¶38}** After a thorough review of the record, we find no abuse of discretion in the trial court's decision denying Lindsey's request to disqualify counsel. The trial court's decision was made after careful and deliberate consideration of the relevant factors. The record shows that at the final pretrial held five days before trial, Lindsey did not express any dissatisfaction with this three-attorney legal team. Accordingly, the trial court's denial of Lindsey's motion to disqualify counsel was not unreasonable because the record supports that Lindsey's day-of-trial request was made for the purpose of delay.

**{¶39}** Accordingly, Lindsey's second assignment of error is overruled.

### III. Mistrial

**{¶40}** In his third assignment of error, Lindsey contends that the trial court denied him his right to a fair trial when it denied his motions for mistrial. Although Lindsey made several motions for mistrial during trial, he raises only two instances on appeal — (1) purported Crim.R. 16 violations; and (2) purported impermissible comments made by the state during closing arguments.

**{¶41}** The granting or denying of a motion for mistrial under Crim.R. 33 rests within the sound discretion of the trial court. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). A trial court should only declare a mistrial when "the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

## A. Crim.R. 16 Violation

**{¶42}** A week before trial, defense counsel was advised that during a 2015 search in Maple Heights, a gun was recovered that ballistically matched .40-caliber Smith & Wesson spent shell casings recovered on East 113th Street. The state advised the defense that Detective Johnson, who was not listed on the state's witness list, would be testifying about the search warrant that resulted in the discovery and recovery of the gun. The parties purportedly reached an informal agreement that Detective Johnson would only testify about the gun. Although all parties knew that Detective Johnson was a gang unit detective, there was no indication that he would testify about gang affiliation or Lindsey's affiliation with any gang members. The record reveals that the trial court was not made aware of any "agreement" between the parties and the defense did not advise the court about the limited nature of Detective Johnson's testimony.

**{¶43}** During direct examination, the state questioned Detective Johnson about his experience and qualifications, including those relating to the gang unit. The state further questioned him about gangs in Cleveland, and the questioning evolved into Detective Johnson testifying about gang activity, Lindsey's affiliation with an East 93rd and Marah Gang member, and that two known gang members were seated in the courtroom during trial. Although defense counsel objected, counsel did not notify the court about the supposed limited nature of Detective Johnson's testimony. After Detective Johnson completed his testimony, including a thorough cross-examination, defense counsel moved for a mistrial on the basis that Detective Johnson exceeded the scope of the agreement, or requested in the alternative to strike Detective Johnson's testimony. After hearing extensive arguments from both parties, the trial court found that the state violated Crim.R. 16 by not naming Detective Johnson as a witness and then calling him as a witness, but that a request for a mistrial would be denied.

{¶44} The court explained that the defense actually acquiesced to Detective Johnson testifying because they believed that Detective Johnson's testimony about the gun recovery did not appear prejudicial. The trial court correctly recognized that the mistrial motion was not actually based on a discovery violation, but in essence, on a breach of the agreement that Detective Johnson would be providing only limited testimony about the gun.

{¶45} The trial court stated that Detective Johnson's testimony "buttressed" and "expanded on some" of Detective Stockwell's testimony. The trial court found that it was not entirely clear whether the parties had an unambiguous agreement about what Detective Johnson could testify to and, if so, whether the state exceeded the agreement. The trial court found that a mistrial would be a disproportionate remedy for the violation.

{¶46} Instead, the court concluded that the remedy had "already occurred" because Devon Long testified without the state being apprised of what Long would testify to, which the court characterized, albeit mistakenly, as a discovery violation by the defense. The court determined that allowing Long's testimony despite defense's "own discovery violation" was an adequate remedy to the state's violation. The trial court later acknowledged that the defense did not commit a discovery violation — content of testimony is not required. (Tr. 2968.)

{¶47} On appeal, Lindsey contends that the trial court abused its discretion in denying his motion for a mistrial because the nondisclosed evidence was egregious due to specific assurances and representations that were made by the state regarding the nature of the testimony to be offered.

{¶48} The Ohio Supreme Court has held that a trial court does not abuse its discretion in admitting such nondisclosed evidence unless it is shown that "(1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the

accused's defense, and (3) the accused suffered prejudice." *State v. Jackson*, 107 Ohio St.3d 53, 79, 2005-Ohio-5981, 836 N.E.2d 1173, citing *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983). Applying this test, we find Lindsey fails to establish reversible error.

{¶49} As the trial court noted, this was not a discovery violation per se. Once the state was aware of the gun discovery and recovery, it notified the defense that Detective Johnson would testify, and defense counsel was able to interview the detective concerning the gun recovery. The violation complained of is more that the scope of questioning exceeded that which was agreed upon. Lindsey contends the scope of questioning was willful, prior knowledge would have aided in his defense, and the testimony was prejudicial.

{¶50} We initially note that no objection was raised regarding the content of Detective Johnson's testimony once it was readily apparent that the testimony would exceed the scope of the gun discovery. Although the trial judge requested that no speaking objections be made, counsel could have requested a sidebar or recess to address their belief that Detective Johnson expanded the scope of the agreement with the state. The record demonstrates that the trial court was not apprised of any agreement between the parties; thus, the court did not know the basis upon which counsel was objecting during trial. Additionally, even during a recess when counsel raised issues pertaining to Detective Stockwell's prior testimony and documents pertaining to gang activity, counsel did not make the court aware of the purported breach of the gentlemen's agreement regarding Detective Johnson's testimony. A court cannot remedy an error or manifest injustice unless it is made aware of such denial of due process during the trial proceedings. *State v. Brisbon*, 8th Dist. Cuyahoga No. 105591, 2018-Ohio-2303; ¶ 31. Accordingly, it could be argued that any error Lindsey now argues could be deemed invited error.

**{¶51}** Nevertheless, we find no abuse of discretion in the trial court's decision to deny the mistrial based on the discovery violation. The trial court correctly found that the state committed a discovery violation by failing to timely disclose Detective Johnson as a witness. Admittedly, the trial court's "remedy" for the state's violation was not a remedy at all because (and as the trial court later admitted), no reciprocal discovery violation was committed by the defense. Accordingly, the trial court's "two violations cancel each other out" justification was misplaced. However, reviewing the entire record, Detective Johnson's overall testimony was cumulative to or corroborative with Detective Stockwell's testimony regarding gang activity. Thus, Detective Johnson's testimony regarding gang activity was harmless, at best.

**{¶52}** We are troubled, however, by the state eliciting testimony from Detective Johnson that certain purported gang members were seated in the back of the courtroom during trial. Lindsey contends that this revelation created "a climate of fear and danger to all that were present." This type of questioning is unnecessary; there was no need to apprise the jury of the presence of purported gang members seated in the courtroom. The state risked its case on presenting testimony that was not necessary to prove its case against Lindsey. Under different circumstances, this tactic could be reversible error.

## B. Closing Arguments

**{¶53}** Lindsey also contends that the trial court erred in denying his motion for a mistrial following the state's impermissible comments during closing argument. Specifically, he contends that the state (1) commented on the credibility of Anderson and Devon Long; (2) insinuated that the defense tampered with a witness; (3) stated that the defense failed to produce evidence to support its case; and (4) claimed that Lindsey was supported by a gang member

seated in the courtroom. According to Lindsey, these comments were unfairly prejudicial and deprived him of a fair trial.

**{¶54}** Closing arguments must be viewed in their entirety to determine whether the disputed remarks were prejudicial. *State v. Mann*, 93 Ohio App.3d 301, 312, 638 N.E.2d 585 (8th Dist.1993). In general, a prosecutor has considerable latitude in his closing argument. *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). "The state is largely free to comment on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). The test for prosecutorial misconduct during closing argument is whether the remarks made by the prosecutor were improper and, if so, whether they prejudicially affected a substantial right of the accused. *State v. White*, 82 Ohio St.3d 16, 22, 693 N.E.2d 772 (1998). For this determination, this court should consider the nature of the remarks, whether an objection was made by counsel, whether corrective instructions were given by the court, and the strength of the evidence against the defendant. *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995). Additionally, "isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

**{¶55}** In this case, the trial court specifically instructed the jury that the attorneys "are given plenty of leeway" during closing arguments and that they are "given broad discretion in making any reasonable arguments to you based upon the evidence." (Tr. 3007-3008.)

**{¶56}** Lindsey first contends that the state improperly commented on the credibility of Anderson and Devon Long. Lindsey points to two single isolated comments about believability

and truthfulness. The first pertains to Anderson identifying Lindsey in a police array, picking him out "because she was being truthful." (Tr. 3034.) The trial court sustained the objection raised. Moreover, the state contradicted itself immediately following this comment by stating that Anderson did not pick Lindsey in the array. The sustained objection and the contradiction render the isolated comment harmless.

{¶57} Pertaining to the comment about Devon Long, Lindsey again challenges an isolated comment where the state opined that "we don't believe any of that. And we don't believe that you can believe anything that Devon Long testified to." (Tr. 3044.) When viewing the content of this statement, the statement was in reference to the type of car Long purportedly borrowed from Lindsey, not to his overall credibility.

{¶58} Admittedly, "[a]n attorney may not offer a belief or opinion about the credibility of a witness." *State v. Jackson*, 92 Ohio St.3d 436, 751 N.E.2d 946 (2001). However, in this case, the state repeatedly reminded the jury that credibility was within their province, and they were the sole determiners of who is credible and who is not. (*See, e.g.*, tr. 3082.) Moreover, the trial court, immediately prior to closing arguments, instructed the jury that anything the attorneys said during the trial is not evidence and that the jury is "the sole judges of the credibility or believability of witnesses." (Tr. 2974, 2977-2979.) It is presumed that the jury followed these instructions. These isolated comments about credibility, when viewed in the context of the entire closing argument did not prejudice Lindsey's substantial rights.

{¶59} Next, Lindsey contends that the prosecutor deprived him of a fair trial by insinuating that defense counsel tampered with a state's witness. It is improper, and professionally unethical, for a prosecutor, or any attorney, to attack, or make any attempt to disparage, the character of opposing counsel in front of the jury. *State v. Smith*, 14 Ohio St.3d

13, 14, 470 N.E.2d 883 (1984). In this case, the complained-of comments made by the prosecutor during closing arguments were made in rebuttal after defense counsel argued that Robert Scott could not be believed — "And Robert Scott, you believe this? The state of Ohio, I think it's hilarious, wants you to rely on Robert Scott." (Tr. 3073.) The prosecutor commented on the defense's assertion that Scott was incredible, stating that Scott only changed his testimony and identification of Lindsey after defense counsel visited Scott in prison. Although the insinuation was not appropriate, Lindsey has not demonstrated how he was prejudiced by the state's comments regarding defense counsel.

{¶60} Lindsey further contends that the prosecutor improperly commented during closing argument that the defense failed to produce evidence to support its case. Again, he directs this court to an isolated comment made by the state to rebut the defense's theory of the case that Devon Long was using a vehicle rented by Lindsey. Specifically, the prosecutor commented that Lindsey's theory of the case presented in opening arguments was not supported by the evidence presented at trial. There is nothing improper about this. *State v. Belcher*, 8th Dist. Cuyahoga No. 99127, 2013-Ohio-3142, ¶ 30; citing *State v. Jackson*, 8th Dist. Cuyahoga No. 76141, 2000 Ohio App. LEXIS 1741, 31 (Apr. 20, 2000) (it is not improper for the prosecution, in closing, to point out the lack of evidence supporting the defense theory of the case).

{¶61} Finally, Lindsey maintains that the state's disparaging comments that he was a drug dealer "polluting our community," and about gang members seated in the courtroom supporting Lindsey, appealed to the fears and biases of the jury. Again, the record shows that the comment about the purported gang member seated in the back of the courtroom was objected to and sustained. Moreover, the state did not make any further reference to the alleged gang member or his gang affiliation after this brief objected-to comment. We agree, however, that the comment

was unnecessary, but it does not rise to the level of misconduct to warrant a new trial. Moreover, the comment about Lindsey's lifestyle was based on evidence presented that he trafficked drugs.

{¶62} Viewing the complained-of comments in the context of the whole closing argument and trial, we find that the prosecutor did not engage in misconduct to deprive Lindsey of a fair trial. Moreover, Lindsey fails to demonstrate prejudice that the outcome of the trial would have been different without the comments made by the state during closing argument.

{¶63} Accordingly, we find no abuse of discretion by the trial court in denying Lindsey's motions for mistrial. The third assignment of error is overruled.

## IV. Closing Argument

{¶64} In his fourth assignment of error, Lindsey contends that trial court erred when it allowed impermissible comments to be made by the state during closing arguments, thereby denying him a right to a fair trial. Lindsey raises the same arguments in this assignment of error that he raises in his third assignment of error. Accordingly, for the same reasons as stated above, we overrule Lindsey's assigned error.

## V. Motion to Suppress

{¶65} Lindsey contends in his fifth assignment of error that the trial court erred when it denied his motion to suppress the pretrial identifications of both Anderson and Scott. Specifically, Lindsey claims that police failed to comply with the requirements of R.C. 2933.83, that the procedures were impermissibly suggestive, and that, as a result, the identifications were unreliable.

{¶66} A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. Consequently, we give deference to the trial judge's factual findings but review the application of law to fact de novo. *Id.*

{¶67} R.C. 2933.83 governs the administration of photo arrays and is aimed at preventing the use of unnecessarily suggestive procedures. *State v. Fields*, 8th Dist. Cuyahoga No. 99750, 2014-Ohio-301, ¶ 11. R.C. 2933.83 requires any law enforcement agency to adopt specific procedures for conducting the arrays. Under R.C. 2933.83(C)(1), a trial court must consider evidence of a failure to comply with the required array procedures in adjudicating motions to suppress eyewitness identifications. R.C. 2933.83(C)(1), however, does not provide an independent basis to suppress evidence, and a trial court errs in solely relying on the statute in suppressing an identification. The overriding analysis remains whether the procedure was "impermissibly suggestive." *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 84, citing *State v. Henry*, 6th Dist. Lucas No. L-11-1157, 2012-Ohio-5552 (failure to strictly comply with blind administrator component does not necessarily result in reversible error).

{¶68} Regarding the admissibility of identification testimony in general, courts have adopted a two-prong test. First, the trial court must determine whether the identification procedures were so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. *See Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Second, the trial court must determine whether the identification itself was unreliable under the totality of the circumstances. *Id.*

{¶69} If the defendant fails to meet the first part of his burden that the procedures used were unnecessarily suggestive, the court need not consider the totality of the circumstances under the second prong. *State v. Tate*, 2016-Ohio-5622, 70 N.E.3d 1056, ¶ 31, citing *State v. Green*,

117 Ohio App.3d 644, 691 N.E.2d 316 (1st Dist.1996). If the pretrial procedures were not suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility. *Id.*

{¶70} If, on the other hand, the defendant establishes that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, was reliable. To determine reliability, the United States Supreme Court instructs courts to consider the following factors: the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Biggers* at 199-200.

{¶71} Lindsey argued in his motion and here on appeal that the photo array was suggestive and the identifications were unreliable because the police did not comply with the minimum requirements of R.C. 2933.83 during both Anderson's and Scott's photo array identifications. Specifically, Lindsey claims that (1) the police failed to elicit any confidence statements from either witness, (2) the photo of Lindsey was the same photo that the media broadcasted to the public; (3) the array consisted of two suspects; and (4) Scott was asked if he recognized "more than one" person.

{¶72} Lindsey and Scott were shown the same photo array containing six photographs of males with similar characteristics and features. The photo array contained a photograph of Lindsey and another suspect in the case, Dunnings. Lindsey contends that the array was impermissibly suggestive because the array contained two suspects and the police failed to procure confidence statements from both Anderson and Scott.

**{¶73}** As the trial court recognized, obtaining confidence statements is preferable because it fixes an identifying witnesses' level of certainty so that future identifications at differing levels of certainty might be explained by external influences or passage of time. R.C. 2933.83(B)(4)(a) requires law enforcement to adopt procedures regarding photo array identification, including the use of confidence statements. The trial court found that although confidence statements were not used, both Anderson's and Scott's photo array identifications were electronically recorded, thus revealing their degrees of certainty. Furthermore, the level of confidence goes to the reliability of the identifications not to the suggestiveness of the procedure. Accordingly, the failure to obtain confidence statements did not make the photo array any more suggestive.

**{¶74}** Additionally, although putting two suspects in the same array increases the chances for misidentification, the risk did not materialize in this case because Anderson only picked out who she recognized as the shooter — Lindsey. Scott picked both suspects, explaining that he knew both of them before September 15. Scott did not identify Lindsey and Dunnings at random, but based on his familiarity with the individuals.

**{¶75}** Specific to Anderson's identification, Lindsey claims the use of the same picture the media displayed to the public caused the array to be impermissibly suggestive and rendered Anderson's identification of Lindsey unreliable.

**{¶76}** Detective Kathleen Carlin testified that she created a photo array after receiving information that Lindsey was in possession of the identified vehicle at the time of the shooting, not based on the vague physical description given by Anderson following the shooting. Detective Carlin admitted that she included a second suspect, Dunnings, in the photo array. The photo array was already created before Anderson arrived at the police station on September 21.

**{¶77}** At the suppression hearing, Anderson testified that the day before she went to the police station, she saw a news broadcast reporting that a suspect was named in the death of Major Howard. The news broadcast showed a picture of Lindsey as the suspect. Anderson testified that when she saw the news broadcast her reaction was: "That that was him, and I remember seeing him." When she went to the police station, she told the detectives about the broadcast and seeing the picture. Another detective came into the room and showed her a photo array and asked whether she recognized anyone. The photo array contained the same picture that the news media broadcasted. Anderson identified the photograph of Lindsey and commented that "he killed my son." She did not identify anyone else in the array.

**{¶78}** After a thorough review of the record, we are not convinced that the use of the same picture in the photo array that was also shown in the news broadcast amounts to the kind of impermissible suggestiveness affecting the admissibility of Anderson's pretrial identification. Rather, Lindsey's argument is directed primarily at the conduct of Anderson, not the conduct of the police. "The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state." *State v. Brown*, 38 Ohio St.3d 305, 310, 528 N.E.2d 523 (1988). When the questionable circumstances of an identification procedure are not due to state action, the reliability of the identification is a question going to the weight of the testimony, not its admissibility. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 22. Accordingly, "[i]f the police have not manipulated the media in any way, exposure to a media reports is not a sufficient ground to suppress the identification." *Sate v. Ware*, 10th Dist. Franklin. No. 04AP-43, 2004-Ohio-6984, ¶ 52.

**{¶79}** In this case, there is no evidence regarding how the media obtained Lindsey's picture. Detective Carlin explained that when a warrant is filed and becomes a public record, it

identifies the person's name, date of birth, social security number, driver's license number, and last known address. She stated that at times, media outlets will wait at the clerk's office to observe warrants being filed and issued. She denied that a photograph was provided in the warrant package or that the police provided the picture of Lindsey to the media.

{¶80} Accordingly, because the record demonstrates that the photo array was not impermissibly suggestive, any questions as to reliability go to the weight of the identification, not its admissibility. The trial court did not err in denying Lindsey's motion to suppress the pretrial identification made by Anderson.

{¶81} Regarding Scott's pretrial identification on January 7, 2016, Lindsey contends that too much time elapsed between the shooting and the administration of the array, thereby rendering Scott's identification unreliable. There is no evidence that the time between the shooting and Scott's identification was delayed to increase the likelihood that Scott would identify Lindsey and Dunnings. Instead, the delay was precipitated by Scott's two previous statements to police that he did not recognize anyone in the white vehicle or know who was responsible for the shooting. Whatever unreliability exists in Scott's identifications comes from Scott himself, not from something the police did or failed to do. The passage of time does not amount to the array being unnecessarily suggestive.

{¶82} Because Lindsey has failed to demonstrate that the procedures employed by the police in administering the photo array identification were both suggestive and unnecessary, we need not determine whether the identification was unreliable. *Green*, 117 Ohio App.3d at 653, 691 N.E.2d 316. The reliability of the identifications goes to the weight of the evidence, not its admissibility. Accordingly, the trial court did not err in denying Lindsey's motion to suppress the pretrial identification made by Scott.

**{¶83}** The fifth assignment of error is overruled.

## VI.  Admission of Exhibits

**{¶84}** During trial, the state questioned Scott about his prior statements to the police and his identification of Lindsey as the shooter.  Specifically, the state questioned Scott about the photo array he was shown on January 7, 2016, from which he picked Lindsey as the shooter.  The state identified this photo array as state's exhibit No. 431.  Over objection, the state questioned Scott about the identification.  Scott admitted that he picked Lindsey and Dunnings from the photo array, but did so only because he heard that they were involved in the shooting.  Scott denied that he saw either Lindsey or Dunnings shoot from the white car on September 15, 2015, which he admitted was inconsistent with what he told police on January 7, 2016.  Following Lindsey's testimony regarding the photo array identification and the narratives attached, the state sought admission of the exhibit to the jury.  The defense objected, contending that the photo array was extrinsic evidence and inadmissible under the hearsay rules.  The state argued that pursuant to Evid.R. 613, extrinsic evidence could be used for impeachment purposes.  The trial court allowed the admission of the photo array but limited it only to the first page containing the photographs and Scott's identifying markings; the narrative page was omitted.

**{¶85}** In his sixth assignment of error, Lindsey contends that the trial court erred by admitting state's exhibit No. 431 because it was hearsay in violation of Evid.R. 802 and 803.  Specifically, Lindsey contends that the state's use of the photo array was not used solely for impeachment, but was used as substantive evidence, i.e., to prove the truth of the matter asserted that Scott picked Lindsey out of the photo array as the shooter.  And because it was used for this purpose, Lindsey contends that the photo array was inadmissible hearsay under Evid.R.

801(D)(1)(a).  The state contends on appeal that the photo array identification was admissible under Evid.R. 613, but that it was also not hearsay pursuant to Evid.R 801(D)(1)(c).

**{¶86}** "The trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court."  *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).  A trial court abuses its discretion if its evidentiary ruling is "unreasonable, arbitrary, or unconscionable."  *State v. Connally*, 10th Dist. Franklin No. 16AP-53, 2016-Ohio-7573, ¶ 23, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶87}** Evid.R. 613 is not applicable.  When a calling party seeks to impeach its own witness through extrinsic evidence of a prior inconsistent statement, that party must first show surprise and damage by the witness's testimony pursuant to Evid.R. 607, and then examine the witness about the prior inconsistent statement before introducing the extrinsic evidence pursuant to Evid.R. 613(B).  *State v. Darkenwald*, 8th Dist. Cuyahoga No. 83440, 2004-Ohio-2693, ¶ 33.  In this case, the state was not surprised by Scott's testimony that his statements to police and identifications were inconsistent with his trial testimony because Scott previously testified at the suppression hearing that he was untruthful with the police in identifying Lindsey as the shooter.  Accordingly, the photo array was not admissible pursuant to Evid.R. 613.

**{¶88}** Assuming without deciding that the exhibit was inadmissible hearsay, its admission would be harmless.  Harmless error is an error that does "not affect substantial rights."  Crim.R. 52(A).  The harmless error standard asks whether the rights affected are substantial and, if so, whether a defendant has suffered any prejudice as a result.  *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 36.

**{¶89}** The admission of exhibit No. 431 is harmless because Scott testified about his prior statements to police. He admitted that on September 15 and 16, 2015, he told police that he did not see the shooters inside the white four-door car traveling northbound on East 113th towards Regalia. He further admitted that he was untruthful to the police about knowing Nance. At trial, he also admitted that on January 7, 2016, he asked to give information to the police as a "confidential informant." On that date, he told the police that he saw "Nell shooting from the driver's side" of the white car. (Tr. 1989.) He further told the police that day that "A.D." was also in the car. (Tr. 1991.) When he was presented with a photo array, he was asked "if he knew anyone." He identified "A.D." as a possible shooter and Lindsey as the person shooting.

**{¶90}** Scott further admitted at trial that at a hearing on February 6, 2017, he stated under oath that he was untruthful when he said he saw the shooters, and that he saw "Nell with a gun;" he stated he "never saw Nell shooting." When questioned about the photo array identification, Scott stated that he made the identification based on what others were saying and from what he heard about videos posted on social media. In fact, Scott stated that when he made the identification, he said "we know it was Nell," meaning that he was merely reiterating what he heard. He stated that any identification he made in the photo array was not based on personal knowledge or observation.

**{¶91}** The jury heard Scott's testimony and all the prior consistent and inconsistent statements he made to the police. The admission of exhibit No. 431, which only showed Scott's markings of both A.D.'s and Lindsey's pictures, was merely cumulative to his testimony. The narrative attached to the photo array was excluded. It was for the jury to decide the credibility of Scott and on what day, if any, Scott was being truthful. The impeachment of Scott's credibility

occurred by his own testimony, not based on any extrinsic evidence. Accordingly, we cannot say that Lindsey was prejudiced by the admission of exhibit No. 431.

{¶92} The sixth assignment of error is overruled.

### VII. Jury Instruction — Prior Inconsistent Statement

{¶93} In his seventh assignment of error, Lindsey contends that the trial court erred when it denied his request for a jury instruction on prior inconsistent statements. Specifically, he requested that a more specific instruction be given that would encompass the fact that Scott's photo array identification could not be used as substantive evidence of guilt, but that Scott's prior consistent statements under Evid.R. 801(D)(b) could be substantive evidence.

{¶94} The giving of jury instructions is within the sound discretion of the trial court, and we review it for an abuse of discretion. *State v. Howard*, 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176, ¶ 35, citing *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993). However, "[a] reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error." *State v. McKibbon*, 1st Dist. Hamilton No. C-010145, 2002-Ohio-2041, ¶ 4, citing *State v. Adams*, 62 Ohio St.2d 151, 154, 404 N.E.2d 144 (1980).

{¶95} In this case, the trial court instructed the jury that the case must be decided only on the testimony of the witnesses and the evidence presented. As we previously found, the state's use of exhibit No. 431 was harmless error, if error at all. The jury heard Scott's own testimony and explanation surrounding his involvement with the case.

{¶96} In fact, Scott's prior statements to the police and identifications, or lack of identification of Lindsey, was arguably beneficial to both the state and the defense. The day of

the shooting and the day after, Scott denied seeing the shooters. This statement to the police was consistent with his testimony, under oath, at both the suppression hearing and at trial. Although Scott identified both A.D. and Lindsey in the photo array, he was asked "if he knew anyone" and Scott testified that he only made the identifications based on what he heard, not on actual observation. Accordingly, the jury instruction given by the court was sufficient to allow the jury to assess what weight, if any, should be afforded to Scott's identifications, including the photo array identification.

{¶97} Accordingly, the trial court did not abuse its discretion in denying Lindsey's request for a limiting instruction on the photo array identification. The seventh assignment of error is overruled.

## VIII. Sufficiency of the Evidence

{¶98} In his eighth assignment of error, Lindsey contends that his convictions are not supported by sufficient evidence.

{¶99} A Crim.R. 29 motion challenges the sufficiency of the evidence. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-829, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61

Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Circumstantial evidence has the same force and effect as direct evidence. *Jenks*, at paragraph one of the syllabus.

{¶100} Lindsey argues that insufficient evidence was presented as to all counts because the state could not identify the shooter. Viewing the evidence in the light most favorable to the state, both direct and circumstantial evidence identified Lindsey as the shooter.

{¶101} Multiple witnesses testified that they observed a white four-door vehicle travel northbound on East 113th toward Regalia Avenue with at least one of the occupants shooting from the inside toward the eastside of the street where Smith and Major were seated in a parked vehicle and Mangham was standing on the sidewalk.

{¶102} The white four-door vehicle was connected to Lindsey through Konopinski's testimony. He testified that at the request of Lindsey, he rented a white four-door Toyota Yaris on September 11, four days before the East 113th shooting. Konopinski told police that on the day of the shooting, Lindsey told him that he needed to report the vehicle as stolen. The next morning, Lindsey called Konopinski and told him that "it was all taken care of." The car was subsequently found badly burned, with significant damage to the front seating area of the vehicle. Cell phone records corroborated Konopinski's testimony that he was in communication with Lindsey.

{¶103} Additionally, Anderson identified Lindsey as the person who was shooting the firearm in that direction from the white vehicle. Detective Kooser testified that multiple bullet fragments were recovered from the driver's side of Smith's car. Additionally, at one point during the investigation, Scott identified Lindsey as involved in the shooting.

{¶104} It is not fatal to the state's case that neither law enforcement nor forensic medical evidence could articulate whose bullet killed Major. The unrecovered bullet that killed the child

entered through the right side of his chest and exited through his back. Based on how Major was standing in the front seat of Smith's car, the entry wound was consistent with a shot from someone shooting toward Smith's vehicle.

{¶105} The testimony revealed that the shooting was likely in response to a gang-related feud, and the seeming target was Mangham because the shots were fired in his direction. The fact that Major Howard was shot and killed instead does not alleviate Lindsey's culpability. *See State v. Solomon*, 66 Ohio St.2d 214, 421 N.E.2d 139 (1981) (purpose to cause the death of another can be transferred to an unintended victim where there is evidence of intention to kill a specific individual, but another individual is accidently killed instead).

{¶106} Lindsey advances additional arguments challenging the sufficiency of the evidence — the pretrial identifications were tainted, the witness testimony and evidence failed to tie him to the crime scene, ballistic evidence was inconclusive regarding whose bullet killed Major Howard, and leads identifying other potential suspects were not investigated. However, these arguments challenge the manifest weight of the evidence, not sufficiency.

{¶107} Based on the direct and circumstantial evidence presented, the state presented sufficient evidence to support Lindsey's convictions. The eighth assignment of error is overruled.

## IX. Manifest Weight of the Evidence

{¶108} In his ninth assignment of error, Lindsey contends that his convictions are against the manifest weight of the evidence. Specifically, Lindsey asserts that the evidence was unreliable, and the state's improper comments and the trial court's admission of hearsay evidence denied him "of a fair trial by allowing the jury to lose its way." Essentially, Lindsey contends

that the alleged cumulative errors deprived him of a fair trial. As this court has previously determined, any errors committed by the trial court were harmless, at best.

{¶109} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, at ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶110} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶111} In this case, the jury heard testimony from witnesses over a ten-day trial. At times the witnesses contradicted themselves with prior statements and testimony. It was within

the province of the jury to sort through the evidence and determine and weigh credibility. Anderson identified Lindsey as the shooter, Konopinski's testimony and cell phone records linked Lindsey to the shooting, and Lindsey's subsequent flight to Georgia reveal that this is not the exceptional case where the jury clearly lost its way and a new trial must be ordered. Accordingly, Lindsey's convictions are not against the manifest weight of the evidence. The assignment of error is overruled.

{¶112} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

LARRY A. JONES, SR., J., CONCURS;
SEAN C. GALLAGHER, P.J., CONCURS IN PART WITH SEPARATE CONCURRING OPINION

SEAN C. GALLAGHER, P.J., CONCURRING IN PART WITH SEPARATE CONCURRING OPINION:

{¶113}   I concur with the majority decision in all respects except for ¶ 52.