[Cite as *State v. Pettaway*, 2025-Ohio-1181.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,         :

                                     No. 114051

    v.                          :

ANDRE Q. PETTAWAY,                      :

    Defendant-Appellant.        :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
                 AND REMANDED
**RELEASED AND JOURNALIZED:** April 3, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-689050-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Jeffrey S. Schnatter and Margaret Graham,
Assistant Prosecuting Attorneys, *for appellee.*

John B. Gibbons, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} Defendant-appellant Andre Q. Pettaway, Jr. ("Pettaway") appeals his convictions for one count of murder and five counts of improper discharge of a firearm into a habitation. In separate assignments of error, Pettaway contends there was insufficient evidence to sustain each of his convictions and that each conviction

was against the manifest weight of the evidence. For the reasons that follow, we affirm Pettaway's conviction on the murder count and affirm Pettaway's conviction on one of the five counts of improper discharge of a firearm. We vacate the convictions on the remaining four counts of improper discharge of a firearm and remand to the trial court for resentencing.

## I. Facts and Procedural History

{¶ 2} Derrion Miller ("Miller") was killed in a drive-by shooting on the morning of March 26, 2023, while visiting with friends at a home located at 6970 Kinsman Road, Cleveland Ohio. Pettaway and two codefendants, Drequan Wood ("Wood") and Michael J. Creer, Jr. ("Creer"), were eventually indicted on charges related to the killing. Pettaway was charged with one count of felony murder, one count of felonious assault, six counts of improper discharge of a firearm into a habitation, one count of discharge of a firearm on or near prohibited premises and one count of having a weapon while under disability. The felony-murder, felonious-assault, and improper-discharge counts each carried one-, three-, and five-year firearm specifications. The count of discharge of a firearm on or near prohibited premises carried a one- and three-year firearm specification.

{¶ 3} Pettaway and his codefendants were tried together before a jury. At trial, the State presented 17 witnesses, which, for the most part, can be broken down into two groups: (1) witnesses who were present at 6970 Kinsman Road during the drive-by shooting, and (2) witnesses who, on behalf of the State, investigated the

shooting. None of the defendants testified nor called any witnesses of their own at trial.

### A. Witnesses to the Shooting

{¶ 4} The witnesses who were present at the shooting collectively testified that in the early morning hours of March 26, 2023, they were gathered in the living room of a home located at 6970 Kinsman Road, Cleveland, Ohio, when numerous shots were fired into the home. Those shots passed through the kitchen located at the back of the home, into the living room where the group was gathered. One of the individuals present that night, Brandon Abercrombie, had a gun with him and returned fire towards the back of the home — the direction from which the shots were coming.

{¶ 5} Miller, who was situated in the middle of the living room at the time of the shooting, was hit in lower abdomen by one of the bullets passing through the home. Emergency services were called and responded to the scene. By the time they arrived, the shooting had ended and no suspects were in sight. Miller was unconscious and bleeding from the abdomen. Emergency services transported Miller to a hospital where he later succumbed to his injuries.

{¶ 6} The witnesses present on the night of the shooting testified that they had no ability to see who was shooting at them. One of the residents of the home, Shardasia Cannon, testified that she had initially suspected the shooter to be her ex-boyfriend, Rayshawn Wicks, because Wicks and Abercrombie had gotten into a fight at her home the day before and Wicks had texted her that he was going to "shoot up"

the place. Cannon testified that when police arrived on the scene, she informed them about Wicks's text. Kaevonna Smith, another witness who was present during the shooting, testified that she had seen a text exchange between Miller and Wicks in the hours prior to the shooting, in which Wicks had said to Miller, "You all dead in that b - - - - h." Smith shared this text message with the police when they arrived.

### B. Investigative Witnesses

{¶ 7} The second group of witnesses who testified on behalf of the State at trial were the individuals responsible for investigating the shooting. Collectively, these individuals testified that numerous bullet casings were recovered from the scene of the crime. Specifically, 36 casings had been recovered from a parking lot behind the home and five bullet casings were recovered from inside the home. Forensic analysis of the bullet casings found behind the home showed that two separate guns had been used in the shooting. The five bullet casings recovered from inside the home were identified as belonging to a single gun.

{¶ 8} Investigators were further able to recover surveillance footage from a camera owned by the Cuyahoga Metropolitan Housing Authority ("CMHA") located on the street behind the home where the shooting occurred. This footage, although poor in quality, captured the shooting while it was in progress. Specifically, it showed a silver Kia SUV pulling up behind the home and several muzzle flashes coming from inside the vehicle. These flashes appeared to be coming from both the driver's seat of the vehicle, as well as the back seat of the vehicle on the driver's side.

{¶ 9} Investigators obtained additional surveillance video from city cameras located on main thoroughfares near the home where the shooting occurred, a party-center parking lot, and two gas stations in the area. From this footage, investigators were able to piece together a more-or-less continuous video of the suspect Kia SUV's travels both prior to, during, and immediately following the shooting. A compilation video of the footage, labeled State's exhibit No. 223, was introduced at trial by Tom Ciula, a video-forensic analyst working for the Cleveland Division of Police. In relevant part, the video shows three individuals getting into the suspect Kia SUV at the Kinsman Party Center parking lot located at E. 93rd Street and Kinsman Road at around 2:42 a.m., approximately 15 minutes before the shooting. An individual dressed in an all red outfit gets into the driver's seat of the vehicle, an individual dressed in a grey hoodie gets into the front-passenger's seat, and an individual wearing a red, white, and blue tricolored jacket getting into the back seat. The video shows the Kia SUV idling in the party-center parking lot for several minutes before it pulls out of the parking lot at 2:51 a.m. The video then cuts to 2:54 a.m. when it shows the Kia SUV traveling down the road. The compilation cuts to 2:56:20 a.m., and shows the CMHA video of the SUV pulling up behind the home located at 6970 Kinsman Road, where the shooting takes place. Muzzle flashes are observed from inside the vehicle. The video then cuts to a street view at 2:56:33 a.m. showing the suspect Kia SUV pulling out of the housing complex where the shooting occurred. The video then shows the vehicle traveling down the road, at which point the video zooms in on the driver's-side window of the vehicle as it is

traveling to show a figure dressed in red driving the vehicle. The Kia SUV is next seen pulling into a Shell gas station at 2:58 a.m., where it idles for several minutes before a person dressed in a grey hoodie exits the passenger-side door of the car and walks into the gas station convenience store. A clear video from inside the Shell station shows this person making a purchase before returning to the Kia SUV. The video next shows the Kia SUV idling in the Shell gas station parking lot for several additional minutes before pulling out of the lot at 3:08 a.m. The video continues by showing the Kia SUV traveling down the road again. At 3:13 a.m., the Kia SUV is seen pulling into a Rapid Stop gas station at which point the driver, wearing the all red outfit, and the backseat passenger, wearing the tricolored jacket, exit the vehicle. The video shows the backseat passenger in the tricolored jacket walking into the Rapid Stop convenience store, followed by the driver of the Kia SUV who joins the man in the tricolored jacket. Both men proceed to laugh and chat with others while in the Rapid Stop.

{¶ 10} The three suspects associated with the Kia SUV were identified by police through a series of still photographs taken from the video-surveillance footage. Specifically, Andrew Hayduk, the lead detective assigned to the case, testified that the video-surveillance footage gathered from the Rapid Stop gas station showed clear face shots of the individual in the all red outfit who had been driving the car — later to be identified as Drequan Wood — and the individual in the tricolored jacket who had been a passenger in the backseat — later to be identified as Andre Pettaway. The video-surveillance footage gathered from the Shell station

showed clear face shots of the individual in the grey hoodie who had ridden in the front passenger seat of the car — later to be identified as Michael Creer. Det. Hayduk testified that he took still photos of the suspects to Shardasia Cannon and another witness who had been in the home on the night of the shooting, Shaniya Alston. Together, Cannon and Alston were able to identify the suspects in the photos as people they either knew, or knew of, and they were able to provide the investigators with the suspects' nicknames. Specifically, the two women were able to identify Wood as a person they knew of by the name of "Sav," Creer as a person they knew of by the name of "Juice," and Pettaway as a person they knew of by the name of "Dre." Cannon and Alston also provided the investigators with the suspects' Instagram handles. From there, the investigators were able uncover the suspects' true names, phone numbers, and addresses.

{¶ 11} On March 28, 2023, the police executed a search warrant on Drequan Wood's home where they located a red sweat outfit consistent with the outfit worn by the driver of the Kia SUV. Police also recovered several 9 mm handgun magazines and a MasterPiece Arms 9 mm firearm from the home. Forensic testing uncovered gunshot residue on the sleeve of the red sweat outfit, and ballistics testing revealed that the MasterPiece Arms firearm was a match for 25 of the bullet casings recovered from outside the home where the shooting occurred.

{¶ 12} Wood was arrested following the search of his home. While in custody, Wood admitted to driving the Kia SUV on the morning of March 26, 2023. He also admitted that he was driving around with people whom he knew by the

name of Juice and Dre. Wood however denied being involved in any kind of shooting.

{¶ 13} Mapping of cell phone data later done as part of the investigation showed that Wood's and Creer's cell phones were together at the time of the shooting and in the vicinity of 6970 Kinsman Road, where the shooting occurred. No cellular data was recovered with regard to Pettaway's cell phone for the timeframe involving the shooting.

{¶ 14} Following Wood's arrest, Creer posted a story to his Instagram account showing a video of him, Wood, and Pettaway hanging out in an unknown kitchen and dressed in the same clothes they had worn on the night of the shooting. The words "Free Sav" were written across the video along with other text. Thereafter, arrest warrants issued for Creer and Pettaway.

{¶ 15} Creer was arrested following a traffic stop in April 2023. Pettaway was taken into custody on July 12, 2023. During an interview with Det. Hayduk while in custody, Pettaway identified himself in the videos but denied that he knew who the other two individuals were in the Kia SUV the morning of the shooting at 6970 Kinsman.

### D. Verdict and Sentence

{¶ 16} At the close of the State's case, Pettaway moved for acquittal on all of the charges filed against him, pursuant to Crim.R. 29. The trial court granted the motion for acquittal with regard to the charge of having a weapon while under disability. The State voluntarily dismissed the felonious-assault count, one of the

counts of improper discharge of a firearm into a habitation, and the improper-discharge-of-a-firearm-across-a-roadway count.

{¶ 17} At the state's request, the jury was instructed on an aiding-and-abetting theory of liability with regard to Pettaway. Under this theory, the jury was instructed it could find Pettaway guilty of felony murder and improper discharge of a firearm into a habitation even if it found that Pettaway was not the principal offender, so long as the jury found that he aided or abetted the principal offender in the commission of the offenses.

{¶ 18} At the close of trial, the jury found Pettaway guilty of felony murder with one-year, three-year and five-year firearm specifications, and guilty of five counts of improperly discharging a firearm at or into a habitation with one-, three-, and five-year firearm specifications.

{¶ 19} For the purposes of sentencing, the trial court merged the five counts of improper discharge of a firearm with the felony-murder count, and the State elected to proceed to sentencing on the felony-murder conviction. The trial court sentenced Pettaway to a term of life imprisonment with parole eligibility after 15 years on the felony-murder conviction. The court also imposed the five- and three-year firearm specifications on the felony-murder count to run consecutive to each other, and consecutive to the base 15 years on that count. Lastly, the court imposed a three-year firearm specification and one-year firearm specification on two of the convictions for improper discharge of a firearm. The court ordered the three- and one-year firearm specifications to be served consecutively to each other and to the

prison terms already imposed. Altogether, Pettaway was ordered to serve an aggregate term of life in prison with parole eligibility after 27 years.

{¶ 20} Pettaway now appeals his convictions by raising the following two assignments of error:

> (1) The trial court erred in failing to grant judgment of acquittal for each and every count of the indictment, as the evidence introduced by the state of Ohio was insufficient to sustain a conviction on each related, charged count of the indictment, as a matter of law.

> (2) The jury verdicts on each and every count of conviction were against the manifest weight of the evidence.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 21} In his first assignment of error, Pettaway contends that the State failed to produce sufficient evidence to support his convictions for felony murder and improper discharge of a firearm because it did not present any direct evidence that he was in the Kia SUV during the shooting. Pettaway also contends that there was insufficient evidence to convict him of the charges because the State failed to produce any direct or circumstantial evidence that he actually fired a gun or that he aided and abetted another in the commission of the offenses.

{¶ 22} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). On review from a sufficiency-of-the-evidence challenge, appellate courts examine the evidence in the light most favorable to the state and determine whether any rational trier of fact could have

found that the state proved all of the essential elements of the crime. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Thompkins* at 386. "In determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Mosley*, 2015-Ohio-1390, ¶ 7 (10th Dist.). In conducting their review, appellate courts "must remain mindful that the elements of an offense may be established by direct evidence, circumstantial evidence, or both." *State v. Crossley*, 2016-Ohio-3196, ¶ 16, citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

{¶ 23} Pettaway was convicted of felony murder in violation of R.C. 2903.02(B), which states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." The offense of improper discharge of a firearm into a habitation in violation of R.C. 2923.161(A)(1) was the underlying felony offense of violence that served as the predicate offense for the felony murder charge against Pettaway. R.C. 2923.161(A)(1) states that "[n]o person . . . shall knowingly . . . [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual . . . ." Furthermore, Pettaway's convictions were based on a theory of accomplice liability, principally, aiding and abetting under R.C. 2923.03(A). This statute states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall

. . . aid or abet another in committing the offense." Anyone who violates this statute "shall be prosecuted and punished as if he was a principal offender." R.C. 2923.03(F).

{¶ 24} We disagree with Pettaway's contention that the State failed to present sufficient evidence to support his convictions because it did not present direct evidence that Pettaway was in the Kia SUV at the time of the shooting. Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). In contrast, "circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence." *Id.* As noted above, when it comes to satisfying each element of an offense under the sufficiency of the evidence standard, there is no cognizable difference between direct and circumstantial evidence. Accordingly, the State was not obligated to produce direct evidence that Pettaway was in the car; circumstantial evidence permitting an inference of the same was all that was required.

{¶ 25} While it is true that in this case the State did not present any direct evidence that Pettaway was in the Kia SUV at the time of shooting — because none of the witnesses could identify who had shot at them and the CMHA video was of such poor quality that it did not show the faces or other identifying characteristics of the perpetrators — the State did present sufficient circumstantial evidence that Pettaway was in the car when the crimes were committed. Specifically, State's

exhibit No. 223, the compilation video introduced at trial by Tom Ciula, shows a person in a tricolored jacket (identified as Pettaway) getting into the backseat of the Kia SUV at the Kinsman Party Center parking lot just prior to the shooting. The same video shows the person in the tricolored jacket (again, identified as Pettaway) exiting the vehicle just after the shooting, when the Kia SUV pulls into a Rapid Stop gas station. From this video, a jury could infer that Pettaway was indeed in the Kia SUV at the time of shooting.

{¶ 26} Pettaway's contention that the State failed to produce sufficient evidence of the crimes because it did not introduce any direct or circumstantial evidence that he actually fired a gun, is similarly unavailing in light of the fact that he was convicted on a theory of accomplice lability. Under a theory of accomplice liability, the State was not required to prove that Pettaway himself committed the illegal act of discharging a firearm into a habitation. Instead it was required to prove that Pettaway aided and abetted another in the commission of the illegal act. *See* R.C. 2923.03(A).

{¶ 27} Here, we find that the State did introduce sufficient evidence that Pettaway aided and abetted Wood and Creer in the commission of the offenses. A person satisfies the elements of aiding and abetting "when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal." *State v. Seals*, 2015-Ohio-517, ¶ 34 (8th Dist.), citing *State v. Johnson*, 93 Ohio St.3d 240, 243 (2001), at syllabus. "'[P]articipation in criminal intent may be inferred from presence,

companionship and conduct before and after the offense is committed.'" *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971). However, "'the mere presence of the accused at the scene of the crime, is not sufficient, on its own, to prove that the accused is an aider and abettor.'" *Johnson* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982).

{¶ 28} In this case, the State presented evidence that went beyond Pettaway's "mere presence" at the scene of the crime. The video evidence introduced at trial shows Pettaway hanging out with Wood and Creer in the parking lot of the Kinsman Party Center prior to the shooting and shows them waiting for each other to get into the Kia SUV. Video evidence from the Rapid Stop gas station following the shooting additionally shows both Pettaway and Wood inside the gas station smiling, engaging with one another, and talking to the same people. Nothing about Pettaway's demeanor in these videos suggests that he had been dragged along, against his will, to a significant gun crime. Moreover, the various videos showed Pettaway as the back-seat passenger in the Kia SUV, and evidence was presented indicating shots were fired from the back seat. Lastly, the Instagram story posted by Creer following Wood's arrest, shows Pettaway, Wood, and Creer engaging with each other while hanging out in an unknown kitchen, thus allowing the inference of support and companionship among the three individuals. Taking this evidence together and viewing it in the light most favorable to the State, we conclude that the State presented sufficient evidence that Pettaway aided and abetted Wood and Creer in the commission of the offenses.

{¶ 29} Notwithstanding our determination that the State presented sufficient evidence going to each element of the offense of felony murder and each element of the offense of improper discharge of a firearm into a habitation, we vacate four of Pettaway's five convictions for improper discharge of a firearm into a habitation. The indictment in this case charged Pettaway with multiple counts of improper discharge of a firearm into a habitation based on the fact that multiple people had been in the home at the time of the shooting. In other words, each count related to a different person.

{¶ 30} However, in *State v. Grayson*, 2017-Ohio-7175, ¶ 8 (8th Dist.), this court explained that "a violation of R.C. 2923.161(A)(1) occurs when an offender fires a gun into someone's habitation, regardless of the presence of people" and that "'the crime is not defined in terms of conduct toward another person,'" quoting *State v. Allen*, 2003-Ohio-6908, ¶ 21 (8th Dist.). With this in mind, we find that the state did not produce sufficient evidence to support five counts of improperly discharging a firearm into a habitation, when the evidence presented at trial showed that only one habitation, the home located at 6970 Kinsman Road, had been targeted by the shooters. Since evidence in the record shows that this home belonged to Shardasia Cannon, we affirm Pettaway's conviction on Count 6, which states that Pettaway "knowingly, without privilege did discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of Shardasia Cannon." We vacate the remaining four convictions for improper discharge of a firearm into a

habitation, including the sentences imposed on firearm specifications associated with these counts.

### B. Manifest Weight of the Evidence

{¶ 31} In his second assignment of error, Pettaway argues that each of his convictions is against the manifest weight of the evidence. Since we vacated four of the five convictions for improper discharge of a firearm under Pettaway's first assignment of error, we limit our discussion of Pettaway's manifest-weight challenge to the felony-murder conviction and the remaining improper-discharge-of-a-firearm conviction.

{¶ 32} Unlike a sufficiency challenge, which tests the burden of production of evidence, a manifest-weight-of-the-evidence challenge tests the burden of persuasion — specifically, the State's burden of persuasion at trial. *See Thompkins*, 78 Ohio St.3d at 386. A manifest-weight challenge "addresses the evidence's effect of inducing belief . . . . In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387. Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 33} In support of his second assignment of error, Pettaway has provided this court with little to no argumentation as to why he believes his convictions are against the manifest weight of the evidence other than to say the following:

> A close examination of all the direct and circumstantial evidence, an evaluation of the inference that can be arrived at from the evidence, and weighing of the credibility of the State's witnesses, will lead to the conclusion that there was certainly clearly insufficient evidence to return guilty verdicts on all of the related charged offenses.

Although "a conviction based on insufficient evidence is also, necessarily, against the manifest weight of the evidence," *State v. Rupert*, 2024-Ohio-5027, ¶ 7 (2d Dist.), as noted above, this court finds that the State did in fact present sufficient evidence going to each element of felony murder and each element of the improper discharge of a firearm into a habitation. Accordingly, to the extent Pettaway's manifest-weight claim is based solely upon his sufficiency of the evidence claim, we decline to reverse his convictions.

{¶ 34} To the extent that Pettaway's manifest-weight and sufficiency claims may not be one and the same, we also decline to reverse his convictions. A thorough review of the record shows that there are no apparent inconsistencies in the State's evidence, nor are there any apparent credibility issues with regard to the State's witnesses. We find that the evidence presented at trial weighs in favor of upholding Pettaway's convictions, and as such, it cannot be said that this is one of those rare and exceptional cases where reversal is necessary.

## III. Conclusion

{¶ 35} For the foregoing reasons, we affirm Pettaway's felony-murder conviction and his conviction on Count 6 for improper discharge of a firearm into a habitation, however we vacate Pettaway's convictions on the remaining four counts of improper discharge of a firearm into a habitation, including the sentences imposed for firearm specifications associated with these counts. We remand this case to the trial court for the limited purpose of holding a resentencing hearing.

{¶ 36} Judgment affirmed in part, vacated in part, and remanded to the trial court for proceedings consistent with this opinion.

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

EILEEN A. GALLAGHER, A.J., CONCURS;
KATHLEEN ANN KEOUGH, J., CONCURS IN PART AND DISSENTS IN PART
(WITH SEPARATE OPINION)

KATHLEEN ANN KEOUGH, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 37} I concur with the majority's decision to affirm Pettaway's convictions on Counts 1 and 5 but respectfully dissent from the majority's decision to vacate

Pettaway's convictions of improperly discharging a firearm into a habitation and the attendant firearm specifications, as charged in Counts 2, 3, 4 and 6.

{¶ 38} This issue first arose in the context of a Crim.R. 29 motion for acquittal, raised by Pettaway, who argued that the phrase "temporary habitation" is not defined and further argued that

> [t]here is zero evidence whatsoever that Derrion Miller made that townhouse a permanent or temporary habitation of his own. He did not live there . . . . there's also no evidence whatsoever that [Kaevonna Smith] intended to make that structure a temporary or permanent habitation . . . . Count 7 is with regards to Shaniya Alston. Again, no evidence whatsoever that she intended to make that a permanent or temporary habitation.

(Tr. 1295-1297.)

{¶ 39} Both Wood and Creer joined Pettaway's Crim.R. 29 motion. Over objection, the jury instructions provided:

> [Y]ou must find beyond a reasonable doubt that on or about the 26th Day of March, 2023, in Cuyahoga County, Ohio, the Defendant and/or Defendants did knowingly, without privilege did discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of:
>
> In Count Two:  Derrion Miller;
> In Count Three:  Brandon Abercrombie, Jr.;
> In Count Four:  Kaevonna Smith;
> In Count Five:  Shardasia Cannon;
> In Count Six:  Shania Alston.

{¶ 40} Crim.R. 29 motions are reviewed using the same standard as that used in reviewing the sufficiency of the evidence. *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.). The majority relies on an argument not specifically

raised, or even fully developed by the parties, in reversing four of Pettaway's convictions, contending that only one person's home was shot into. I disagree.

{¶ 41} Rather, I find that Cannon's residence was a "temporary habitation" for the other victims. Although it does not appear that there is any case law exploring the precise meaning of "temporary habitation" as it applies to R.C. 2923.161, I would find that the State presented sufficient evidence upon which the jury could have concluded that the townhouse was a "temporary" habitation of the other victims. While I recognize that this offense applies whether or not somebody is present in the house, I do not think this distinction affects the fact that one dwelling may be a habitation for multiple different people or that each of the 41 bullets fired had the potential to harm one or more of the victims who called Cannon's home their "temporary habitation" for the evening.

{¶ 42} R.C. 2923.161(D) provides that "occupied structure" has the same definition as in R.C. 2909.01, the arson and related offenses definition section. This section defines "occupied structure" as

> any house, building, outbuilding, watercraft, aircraft, railroad car, truck, trailer, tent, or other structure, vehicle, or shelter, or any portion thereof, to which any of the following applies:
>
> (1) It is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present.
>
> (2) At the time, it is occupied as the permanent or temporary habitation of any person, whether or not any person is actually present.
>
> (3) At the time, it is specially adapted for the overnight accommodation of any person, whether or not any person is actually present.

(4) At the time, any person is present or likely to be present in it.

{¶ 43} The Ohio Supreme Court has held that the definitions of "occupied structure" are read in the disjunctive and that the State need only prove one of the four definitions to fit the definition of "occupied structure." *State v. Wilson*, 58 Ohio St.2d 52, 57 (1979). There is no doubt that Cannon's home was an "occupied structure." However, R.C. 2923.161(A)(1) provides that the occupied structure must be either the permanent *or* temporary habitation of *any* individual.

{¶ 44} "Temporary habitation" is also a separate element of the offense and "temporary" was not specifically defined for the jury,[1] nor did the jury request clarification or definition of the term during deliberations. *See, e.g., State v. Blanton*, 2021-Ohio-65, ¶ 12 (8th Dist.). The ordinary meaning of "temporary" is "one serving for a limited time." *See* https://www.merriam-webster.com/dictionary/temporary [https://perma.cc/ZWB5-8XPT]. At the time of the shooting, it was already the early hours of the morning. Cannon, Abercrombie, Smith, Alston, and Miller spent the entire evening together, and Smith's children were with their grandmother for the evening. Smith fell asleep on the couch. Everyone was getting comfortable in the home. None of the testimony implied that any of the victims had gone to Cannon's home with the intention of leaving or not spending the night. Therefore, there was evidence in the record upon

---

[1] "Habitation" was defined for the jury as "the place where a person lives." (Tr. 1352.) The defendants all objected to this definition. Other Ohio case law has defined a habitation as a dwelling place or domicile. *See State v. K.L.P.W.*, 2017-Ohio-5671, ¶ 11 (12th Dist.); *State v. Snyder*, 2011-Ohio-175, ¶ 13 (9th Dist.).

which the jury could have inferred that the victims intended to sleep at Cannon's home, making it their "temporary habitation" in the same way that sleeping at a hotel for an evening makes it a "temporary habitation" because one is inhabiting the hotel room for a "limited time."

{¶ 45} Additionally, the Fifth District considered a situation where an individual was indicted for each number of bullets shot into a home. *See State v. McConnell*, 2023-Ohio-654 (5th Dist.). In *McConnell*, the defendant was charged with 23 counts of discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1), and the jury returned a conviction on all counts and the Fifth District affirmed the convictions. *Id.* at ¶ 15 and 61. It is not unreasonable to conclude that shooting 36 bullets into an occupied structure that was the permanent habitation of one and temporary habitation of four could have and did harm any one of the potential victims.

{¶ 46} Since I find that the State presented sufficient evidence to support Pettaway's convictions and the jury could have inferred from the evidence received that the home was a temporary habitation of the other victims, I respectfully dissent and would affirm Pettaway's convictions in their entirety.