[Cite as *State v. Soto*, 2026-Ohio-1775.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 115582 |
| v. | : | |
| JUAN SOTO, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 14, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-696908-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey S. Schnatter and Michael J. Stechschulte, Assistant Prosecuting Attorneys, *for appellee.*

Edward F. Borkowski, Jr., *for appellant.*

TIMOTHY W. CLARY, J.:

{¶ 1} Defendant-appellant Juan Soto ("Soto") appeals from his convictions and sentencing following a jury trial. For the following reasons, we affirm.

## I. Factual and Procedural History

{¶ 2} This case stems from an April 22, 2024 automobile accident where Soto's Toyota Tundra truck collided with a vehicle driven by Gilmarie Rios ("Rios"). Rios died due to blunt-force injuries sustained in the accident, and her sister H.P. who was a front-seat passenger, sustained serious injuries.

{¶ 3} On April 30, 2024, in Cuyahoga C.P. No. CR-24-691470-A ("Case 691470"), a Cuyahoga County Grand Jury indicted Soto on eight counts related to the automobile accident. Soto pleaded not guilty to the charges, and the case proceeded to trial on November 4, 2024. During voir dire, Soto made an oral motion to retain new counsel, defense counsel made a motion to withdraw, and the court granted both motions. On November 7, 2024, Soto retained new counsel — attorney Christopher Rivero ("attorney Rivero"). The State dismissed the case without prejudice.

{¶ 4} On November 19, 2024, Soto was reindicted in Cuyahoga C.P. No. CR-24-696908-A ("Case 696908"). Count 1 charged Soto with involuntary manslaughter in violation of R.C. 2903.04(A) and further charged that Rios's death was the proximate result of Soto committing or attempting to commit aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a), while under the influence of alcohol ("OVI").[1] Count 1 also included a furthermore clause. Count 2 charged Soto with involuntary manslaughter in violation of R.C. 2903.04(A) and further charged

---

[1] The OVI offense was in violation of R.C. 4511.19.

that Rios's death was the proximate result of Soto recklessly committing or attempting to commit vehicular assault in violation of R.C. 2903.08(A)(2)(b). Counts 3 and 4 charged Soto with aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) against Rios and H.P., respectively, as a proximate result of violating the OVI statute. Counts 5 and 6 charged that Soto recklessly caused serious physical harm to Rios and H.P., respectively, and thereby committed vehicular assault in violation of R.C. 2903.08(A)(2)(b). Count 7 charged Soto with OVI in violation of R.C. 4511.19(A)(1)(a). On November 26, 2024, Soto pleaded not guilty to all charges.

{¶ 5} After numerous pretrials, the case proceeded to a jury trial on August 4, 2025. The State introduced testimony from H.P., Michael Schneider ("Schneider"), Gregory Hyde (Hyde"), Patrolman Anthony Bolivar ("Patrolman Bolivar"), Detective Charles Moten ("Detective Moten"), and Dr. Kaitlin Weaver ("Dr. Weaver").

**A. H.P**

{¶ 6} H.P. testified about the events of April 22, 2024, and her subsequent injuries. Between 11:00 p.m. and 12:00 a.m. on April 21, 2024, H.P. and her sister, Rios, drove in Rios's four-door sedan to a dance club where they met friends. H.P. stated that each sister consumed approximately three alcoholic drinks; H.P. did not think either of them was intoxicated, and she denied that they consumed marijuana that evening. Soto, who was known to Rios, approached the sisters when they first arrived at the club and gave each of them a teddy bear and flowers. According to

H.P., the three of them each drank a shot of Hennessy together, and then Soto whispered a derogatory statement to Rios about her boyfriend before walking away. The sisters did not interact any further with Soto at the club, and the sisters left when the club closed, between 2:15 and 2:30 a.m.

{¶ 7} After leaving the club, the sisters and their friends met in a nearby parking lot to consider their next stop. Soon, another friend — who had a confrontation with Soto while leaving the club — pulled into the parking lot and stated that "somebody popped her tires" at the club. Tr. 562. Suddenly, "Soto stormed in, like, in his truck but driving like a maniac." *Id.* H.P. further stated:

> Okay. So we were all in the parking lot. We were all hanging out. And [Soto] turned in, like, aggressively and was, like, speeding towards, like, all of us. He didn't hit anybody or anything, but he aggressively turned in.
>
> And then that's when everybody was like, okay, it's time to go, it's time to wrap it up, and everyone got in their car.
>
> Me and [Rios] got in her car, and everyone else got in their car as well.

Tr. 563-564. H.P. testified that she did not know where Soto's truck was situated when she and Rios left the parking lot and headed to a gas station. H.P. recalled turning left into the gas station and stated that her next memory was waking up at the hospital.

{¶ 8} H.P. did not recall the details related to the automobile accident with Soto, but most of the events were captured on street cameras and the gas station camera, and the recordings were shown at trial. The recordings showed Rios traveling northbound on Fulton Road, with Soto driving behind her in the same

direction and several cars driving between them. The recordings also showed that as Rios attempted to turn left into a Marathon gas station, situated at the southwest corner of the Fulton Road and Clark Avenue intersection, Soto unsuccessfully attempted to pass to the left of the two cars and Soto's vehicle and struck Rios's vehicle. The force of the impact propelled both vehicles through the intersection of Clark Avenue and Fulton Road, and Rios's vehicle came to rest, in flames, in the Rally's restaurant situated at the northwest corner of the intersection.

{¶ 9} H.P. testified that she sustained a gash in the back of her head, second-degree burns on the left side of her face, third-degree burns on her right arm and back, scarring from the burns, and a fractured leg and pelvis. H.P. further stated that she underwent multiple surgeries and skin grafts, anticipated several future surgeries, and experienced "[a] great amount of pain" that continued for more than a year after the accident. Tr. 569. H.P.'s medical records related to her injuries were introduced as an exhibit.

**B. Schneider**

{¶ 10} On the date of the accident, Schneider was the manager at the Rally's restaurant with which Rios's vehicle impacted. Schneider testified that he used a fire extinguisher to help put out the fire on Rios's vehicle as other individuals pulled the two women from the vehicle. Per Schneider, there were two males in Soto's truck; one attempted to help the victims in the car while Soto asked people in the vicinity if he could borrow their car keys. Schneider stated that he believed Soto wanted to borrow someone's car keys so that he could flee the scene of the accident.

Schneider further stated that once Soto realized the police and emergency services had arrived, he helped extract Rios and P from their vehicle. Schneider further stated that at one point he and Soto were face-to-face and he thought Soto was intoxicated:

> ASSISTANT PROSECUTING ATTORNEY ["APA"]: All . . . Right. Did you notice anything else about [Soto] or was —
>
> SCHNEIDER: You could definitely tell [Soto] was intoxicated.
>
> APA: How is it that you could tell that?
>
> SCHNEIDER: Well, my father's an alcoholic, so I am used to being around people that drink, plus of the strong hint smell of liquor that was on his breath and just the way he was acting. Like, he was fidgety. Like, he wanted to get away from it because he knows that he was drunk and what he did was wrong.

Tr. 506.

## C. Hyde

{¶ 11} Hyde, a paramedic for 36 years with the city of Cleveland's Division of Emergency Medical Services ("EMS"), treated Soto at the accident scene. Hyde stated that while fulfilling his job duties he had encountered many patients under the influence of alcohol, and he explained that glassiness in the eyes, a change of speech pattern, aggressive behavior, disproportionately giddy behavior, and lack of focus during a conversation were indicators that a patient was under the influence of alcohol or other narcotics.

{¶ 12} Soto informed Hyde that he had consumed three beverages prior to the accident. Although Soto did not specify if he drank alcoholic beverages, Hyde

testified that it was his impression that Soto was referencing alcoholic beverages. Hyde testified that Soto's glassy eyes, distinct odor of alcohol, and speech pattern — slurred speech or a "kind of hesitancy" — indicated that he was under the influence of alcohol. Tr. 524. Hyde denied that Soto's unusual speech pattern or glassy eyes were caused by a physical injury he sustained in the automobile accident.

**D. Patrolman Bolivar**

{¶ 13} When Patrolman Bolivar with the Cleveland Division of Police responded to the accident scene, emergency medical personnel and firefighters were already on the scene. Patrolman Bolivar testified that he observed Rios's vehicle, which was "totaled," and Soto's pickup truck at the Rally's restaurant at the corner of Fulton Road and Clark; he further testified that both Rios's vehicle and the Rally's restaurant were on fire. Rios had already been declared deceased when Patrolman Bolivar arrived at the scene.

{¶ 14} Patrolman Bolivar testified that Soto approached him and stated the deceased woman was his sister. Patrolman Bolivar and Soto communicated at the accident scene in both English and Spanish; Patrolman Bolivar testified about their conversation:

APA: And what did [Soto] tell you?

PATROLMAN BOLIVAR: So he said that they were — I don't know. Again, excuse me for cussing. But he said, ["]These bitches were drunk and they crashed.["] Yeah. But he said it in Spanish, cabrónas, which means bitches. And that's what he said, ["]These bitches were drunk and they crashed.["]

APA: Did he describe how that crash occurred?

PATROLMAN BOLIVAR: That they were speeding and then they crashed.

Tr. 475. During cross-examination, Patrolman Bolivar also testified that the term "cabrónas" is used frequently in Puerto Rico as a substitute for "dude," "bro," or "sis." According to Patrolman Bolivar, Soto was alone in his vehicle when the accident occurred; Soto denied that he had been speeding; and Soto told the officer to review the street cameras to observe his speed at the time of the accident. Patrolman Bolivar's body-camera video recording, which depicted his arrival at the scene and his exchange with Soto, was played at trial.

{¶ 15} Patrolman Bolivar testified that in his capacity as an officer it is common for him to interact with individuals who have been drinking alcohol and he received training at the police academy on standardized field sobriety tests ("SFST"). Patrolman Bolivar also stated that the odor of alcohol, glassy and red eyes, and slurred speech are indicators that a person has been drinking.

{¶ 16} Patrolman Bolivar testified that he immediately smelled alcohol on Soto's breath and observed his glassy eyes although he did not observe Soto slurring his speech. Patrolman Bolivar further testified that he would have administered an SFST at the scene, but he did not do so because it was very hectic and Soto was busy being examined by EMS.

{¶ 17} Patrolman Bolivar further stated that he helped transport Soto to MetroHealth Hospital where the officer completed a BMV form also referred to as an Operating A Vehicle While Intoxicated Checklist. The checklist required

Patrolman Bolivar to ask Soto if he wanted to submit to a urine or blood test, and

Soto refused to submit to either test:

> APA: And what is that? The BMV form, what is that?
>
> PATROLMAN BOLIVAR: It's — it's a form where if they're given an OVI, operating a vehicle while intoxicated, it's — you know, there's like a checklist of what we have to basically do. Like, we seize their ID or their driver's license. If they're — if they wanted to take a urine test or a blood test, we will check it.
>
> APA: And was that done here?
>
> PATROLMAN BOLIVAR: At Metro?
>
> APA: Yes.
>
> PATROLMAN BOLIVAR: Yes.
>
> APA: Okay. And did you do that personally?
>
> PATROLMAN BOLIVAR: Yes.
>
> APA: All right. And was a blood test ever done?
>
> PATROLMAN BOLIVAR: Negative.
>
> APA: Was a urine test ever done?
>
> PATROLMAN BOLIVAR: Negative.
>
> APA: Why is that?
>
> PATROLMAN BOLIVAR: Soto refused.

Tr. 490-491.

**E. Detective Moten**

{¶ 18} As a member of the Accident Investigation Unit ("AIU") of the

Cleveland Division of Police, Detective Moten investigates accidents where a fatality

occurred. Detective Moten testified that he had received training in accident reconstruction and crash data retrieval.

{¶ 19} According to Detective Moten, Soto was already in custody when he was assigned to the case and began his investigation. Detective Moten stated that his initial review of the first responding officers' reports led him to conclude the accident happened as follows:

> Well, my understanding is that the white Toyota Tundra was operating at a high speed northbound on Fulton, and it went left of center, but entered into a turn lane as the other vehicle was turning and struck the vehicle, pushing it across the intersection into the Rally's restaurant causing it to go up in flames.

Tr. 627-628. Detective Moten testified that he never considered an alternate suspect or an alternate theory of the case.

{¶ 20} Detective Moten described the Fulton Road and Clark Avenue intersection where the accident occurred. There is one lane in each direction for the northbound and southbound traffic on Fulton Avenue, with a posted speed limit of 35 miles per hour. As the northbound Fulton Road traffic nears the intersection of Clark Avenue, a left turn lane develops that provides vehicles access to turn left — either just before the intersection into a Marathon gas station or at the intersection onto Clark Avenue.

{¶ 21} As part of his investigation, Detective Moten reviewed the real-time camera footage from street cameras positioned on Sackett Avenue and Fulton Road; the real-time camera footage obtained from the intersection of Fulton Road and Clark Avenue; and the video-camera footage recorded by the Marathon gas station

situated at the southwest corner of the intersection. The real-time camera footage showed Rios's and Soto's vehicles traveling northbound on Fulton Road, less than a quarter of a mile from where the accident occurred, with Rios's vehicle in the lead followed by two unknown motorists and then Soto's truck. Detective Moten further described the recordings. Detective Moten stated that as Rios neared the Fulton and Clark intersection, she entered the left-hand turn lane and began to turn into the Marathon gas station; at the same time, Soto drove his truck left of center, across a double solid line, entered the left-hand turn lane, and struck Rios's vehicle. The force of the impact pushed Soto's truck and Rios's vehicle through the Fulton and Clark intersection, with Rios's vehicle erupting into flames and coming to rest in the Rally's restaurant.

{¶ 22} The recordings supported Detective Moten's testimony although they do not depict whether Soto crossed a solid double line. Detective Moten further testified that the video did not show Soto attempting to flee the scene after the accident or attempting to secure keys from people in the area; he stated that the video showed that Soto remained at the scene and, after the victims were extracted from the car, he helped pull them away from the burning car.

{¶ 23} Detective Moten also testified about the crash data recorded on Soto's truck and the report generated to reflecting that information; the report was admitted at trial. According to Detective Moten, Soto drove approximately 94 m.p.h. prior to colliding with Rios's vehicle, and he did not apply his truck's brakes prior to impact.

**F. Weaver**

{¶ 24} Dr. Weaver, a forensic pathologist with the Cuyahoga County Medical Examiner's office, completed the autopsy of Rios and determined she died from blunt-force injuries caused by the motor vehicle accident. According to Dr. Weaver, the alcohol in Rios's body cavity "[wa]s teetering right on the edge of what is considered to be the legal limit in the State of Ohio; but, again, with a margin of error that can put her either below or above." Tr. 601.

{¶ 25} The blood collected from Rios's body cavity was also positive for amphetamines that could include prescription medication such as Adderall; the amount was not "significant or lethal" but "therapeutic if [Rios] was prescribed that class of drugs." Tr. 600. Dr. Weaver conceded that she did not have any information that Rios was prescribed this class of drug. The blood toxicology was also positive for nicotine, presumably from cigarettes, and marijuana.

**G. Crim.R. 29 Motion for Acquittal**

{¶ 26} Following the State's case-in-chief, Soto made a Crim.R. 29 motion for acquittal, and the trial court denied the motion. After the defense rested without introducing any additional evidence, Soto presented a renewed Crim.R. 29 motion that was again denied.

**H. Jury Verdict and Sentencing**

{¶ 27} The jury returned a verdict finding Soto guilty of all charges, and the court referred Soto for a presentence-investigation report. The court conducted a sentencing hearing on August 27, 2025. The court heard from counsel for both

parties, Soto, and a relative of Rios and H.P., and the court reviewed letters provided by defense counsel. The parties agreed that Counts 1, 2, 3, and 5 would merge, and Counts 4 and 6 would merge. The State elected to sentence Soto on Counts 1 and 4.

{¶ 28} On Count 1, involuntary manslaughter, the court sentenced Soto to ten to 15 years on the base charge. The court also sentenced Soto to three years on Count 4, aggravated vehicular assault, and six months in county jail on Count 7, OVI. The court assessed Soto with a fine, driver's license suspension, and points on his driver's license. Counts 1 and 4 were to run consecutively to each other, and Count 7 was to run concurrently to Counts 1 and 4, for an aggregate prison term of 13 to 18 years.

{¶ 29} On September 16, 2025, Soto filed a notice of appeal, and he now presents four assignments of error:

> Assignment of Error I: The trial court abused its discretion by denying [defense] counsel's motion to withdraw and for a continuance.
>
> Assignment of Error II: Appellant's convictions were against the manifest weight of the evidence.
>
> Assignment of Error III: Appellant's convictions were unsupported by sufficient evidence.
>
> Assignment of Error IV: The trial [court] abused its discretion by giving the jury an instruction on appellant's refusal to submit to chemical testing.

**II. Legal Analysis**

**A. Withdrawal of Counsel**

{¶ 30} In his first assignment of error, Soto contends that the trial court abused its discretion when it denied his request for a continuance of the trial to allow him to retain new counsel.

{¶ 31} A criminal defendant has a right to counsel pursuant to the Sixth Amendment of the United States Constitution and Section 10, Article I of the Ohio Constitution. *State v. Milligan*, 40 Ohio St.3d 341 (1988), paragraph one of the syllabus. "[T]he right to choose one's counsel is not absolute, and 'the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he [or she] prefers.'" *State v. Keenan*, 2008-Ohio-807, ¶ 30 (8th Dist.), quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988). Further, the United States Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice . . . against the demands of its calendar." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006). "The trial court's difficult responsibility of assembling witnesses, lawyers, and jurors for trial 'counsels against continuances except for compelling reasons.'" *State v. Nettles*, 2024-Ohio-4910, ¶ 21 (8th Dist.), quoting *Morris v. Slappy*, 461 U.S. 1, 11 (1983).

{¶ 32} Thus,

> "[a] defendant has only a presumptive right to employ his own chosen counsel." *State v. Keenan*, 81 Ohio St.3d 133, 137, 1998-[Ohio-]459, 689 N.E.2d 929 (1998). Factors to consider in deciding whether a trial

court erred in denying a defendant's motion to substitute counsel include "the timeliness of the motion; the adequacy of the court's inquiry into the defendant's complaint; and whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense." *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir.1996). In addition, courts should "balance * * * the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *Id.*

*State v. Lindsey*, 2019-Ohio-782, ¶ 34 (8th Dist.). As to the timing of the motion, "[a] motion for new counsel made on the day of trial 'intimates such motion is made in bad faith for the purposes of delay.'" *Id.* at ¶ 35, quoting *State v. Haberek*, 47 Ohio App.3d 35, 41 (8th Dist. 1988).

{¶ 33} This court reviews a trial court's decision on a motion to withdraw as counsel for an abuse of discretion. *State v. Stewart*, 2018-Ohio-684, ¶ 14 (8th Dist.), citing *State v. Williams*, 2003-Ohio-4396, ¶ 135. An abuse of discretion occurs if the court's attitude in reaching its decision was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An abuse of discretion also occurs if a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 34} Soto was arraigned in Case 691470 in May 2024, and retained counsel. After 11 pretrials and on the second day of trial, the court granted Soto's oral motion to retain new counsel, and one day later Soto retained attorney Rivero as new counsel. Case 691470 was dismissed without prejudice, and Soto was reindicted in Case 696908; attorney Rivero's representation continued in the

reindicted case.  Throughout the pendency of Case 696908, the court conducted 13 pretrials and a final pretrial and granted a joint motion for continuance of trial on June 11, 2025.  The court held two additional pretrials and a final pretrial, and trial commenced on August 4, 2025.  On August 5, 2025, prior to the start of voir dire, defense counsel made an oral motion to continue the trial and a motion for attorney Rivero to withdraw as counsel.  This was the trial court's first notice of any issues between Soto and his attorney.

{¶ 35} Attorney Rivero initially told the court that "some fundamental disagreements" arose between him and Soto on the morning of trial, and Soto "made mention of new counsel" although attorney Rivero did not know if Soto wanted new legal counsel.  Tr. 34.  Attorney Rivero also stated that he might have a problem zealously representing Soto.

{¶ 36} When asked by the court to explain the problem, attorney Rivero stated that since the inception of the case, Soto had voiced his concern about the APA prosecuting the case because the APA previously prosecuted a case against Soto in which Soto was sentenced to five years in prison.  Soto felt that the APA was biased against him and his participation would prevent Soto from receiving a fair trial.  Attorney Rivero stated that the APA had not acted in an improper manner and, therefore, he refused to file what he considered a frivolous motion seeking the recusal of the APA.  Attorney Rivero and Soto disagreed on whether a motion should have been filed to seek the APA's recusal.

{¶ 37} The trial court engaged in discussions with the APA and attorney Rivero. The court stated that the court did not dictate who was assigned to prosecute a case and the APA would be the prosecuting attorney regardless of whether attorney Rivero withdrew as counsel; accordingly, the trial court denied attorney Rivero's motion to withdraw. Soto then stated that he did not want attorney Rivero as his attorney, and the trial court responded, "Well, you picked him as your attorney. You selected him, and he's your second lawyer." Tr. 38.

{¶ 38} Trial resumed the next day, and the court had a detailed discussion about plea offers; Soto declined the offered plea agreement. When the court indicated that the jury would be brought in, Soto stated, "I don't think — well, I don't feel comfortable with [the APA]." Tr. 55. Another lengthy discussion ensued between Soto, the trial court, the APA, the APA's supervisor, and attorney Rivero regarding Soto's concerns about the APA's involvement with the case. Soto made no mention of any concern relating to his own attorney. The trial court ultimately informed Soto that the APA would be prosecuting the case.

{¶ 39} The record demonstrates that Soto freely voiced his concerns to the trial court about the APA. Outside of Soto's single statement that he did not want attorney Rivero as his counsel, all of Soto's dialogue with the court centered on the APA. Soto had an opportunity to verbalize concerns about attorney Rivero, but he did not do so. These conversations were consistent with defense counsel's initial statement that Soto's reservations with him stemmed from attorney Rivero's refusal to seek the APA's recusal.

{¶ 40} After reviewing the record, we find no basis to conclude that the trial court abused its discretion when it denied attorney Rivero's motion to withdraw. The case had been pending since November 2024, numerous pretrials and final pretrials had taken place, and the motion was made on the first day of trial. According to attorney Rivero, the disagreement between Soto and him stemmed from trial strategy and whether a motion should have been filed seeking the recusal of the APA. Disagreements over strategy do not establish good cause to allow counsel to withdraw, particularly where the case has been pending for over a year and the motion is made on the day of trial. *Nettles*, 2024-Ohio-4910 at ¶ 29 (8th Dist.) ("Disagreements over strategy do not suffice to establish good cause to allow counsel to withdraw, especially here where the case has been pending for over a year and the motion was filed just days before trial."). Moreover, even if the trial court granted defense counsel's motion, the APA — the source of Soto's concerns — would have remained as prosecutor.

{¶ 41} Soto also contends that the trial court abused its discretion when it denied his motion for continuance. Specifically, Soto, who had become eligible for bond in June, requested additional time to "get out and work, acquire more funds to hire additional counsel and possibly an investigator." Tr. 80. We cannot find that the trial court abused its discretion when it denied Soto's motion for continuance where the case had been pending for over a year, the court had conducted numerous pretrial hearings, had continued the trial on several occasions, and counsel was prepared and ready to proceed to trial.

{¶ 42} For the foregoing reasons, the trial court did not abuse its discretion when it denied counsel's motion to withdraw or Soto's related motion for continuance. The first assignment of error is overruled.

## B. Sufficiency of the Evidence

{¶ 43} In his second and third assignments of error, Soto contends that his convictions were against the manifest weight of the evidence and unsupported by sufficient evidence, respectively. For ease of discussion, we will address these assigned errors in reverse order.

### 1. Merger

{¶ 44} We initially note that for sentencing purposes, the trial court merged Counts 1, 2, 3, and 5 and sentenced Soto on Count 1, and the court merged Counts 4 and 6 and sentenced Soto on Count 4. This court has previously found that with merged offenses, if there is sufficient evidence to support the offense on which the State elected to have the defendant sentenced, the reviewing court need not consider the sufficiency of the evidence or manifest weight of the evidence on the merged counts because any error would constitute harmless error. *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.), citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990), and *Ramos* at ¶ 15, citing *State v. Worley*, 2016-Ohio-2722, ¶ 23 (8th Dist.). Thus, pursuant to *Ramos*, we will not consider Counts 2, 3, 5, and 6 in our evaluation of the sufficiency of the evidence and the manifest weight of the evidence assigned errors.

## 2. Standard of Review

{¶ 45} Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the State has met its burden of production at trial is conducted. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 33. An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at ¶ 36. A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Id.*

{¶ 46} In a sufficiency inquiry, we also assume that the State's witnesses testified truthfully and evaluate whether that testimony, along with any other evidence introduced at trial, satisfies each element of the offense. *In re D.R.S.*, 2016-Ohio-3262, ¶ 23 (8th Dist.). The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g., State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.), citing *State v. Durr*, 58 Ohio St.3d 86 (1991). Circumstantial evidence and direct evidence have the same probative value. *State v. Jenks* at paragraph one of the syllabus.

{¶ 47} Similarly, Crim.R. 29(A) mandates that the trial court issue a judgment of acquittal where the State's evidence is insufficient to sustain a conviction for an offense. Crim.R. 29(A). Accordingly, we apply the same standard of review to a trial court's denial of a defendant's motion for acquittal as we use when reviewing sufficiency of the evidence. *State v. Taylor*, 2014-Ohio-3134, ¶ 22-23 (8th Dist.), citing *Cleveland v. Pate*, 2013-Ohio-5571 (8th Dist.) ("Crim.R. 29(A) and sufficiency of the evidence review require the same analysis.").

### 3. Analysis

### (a) OVI

{¶ 48} Soto argues that the State failed to introduce sufficient evidence that he was under the influence of alcohol at the time of the accident. While Soto admitted to EMS that he consumed three drinks on the night of the accident and he allegedly smelled of alcohol, he argues that such evidence was insufficient to establish that his consumption of alcohol affected him to the point that it noticeably impaired his ability to operate his truck. Soto contends there was no evidence that he was physically impaired at the scene of the accident. Soto further argues that drinking alcohol and then driving does not automatically demonstrate that he was driving under the influence. Taking into consideration that the OVI conviction was a predicate offense for aggravated vehicular assault and aggravated vehicular assault was a predicate offense for Count 1, involuntary manslaughter, Soto argues that absent sufficient evidence to support an OVI conviction against him, there was also insufficient evidence to support the involuntary-manslaughter convictions.

Accordingly, Soto contends that the trial court erred when it denied his Crim.R. 29 motion at the close of the State's case.

{¶ 49} The OVI convictions against Soto stemmed from R.C. 4511.19(A)(1)(a) that states no person shall operate a vehicle while "under the influence of alcohol, a drug of abuse, or a combination of them." This court has recognized that "to prove impaired driving ability, the [S]tate can rely not only on coordination tests such as the field sobriety tests but also on physiological factors such as slurred speech, bloodshot eyes, and the odor of alcohol." *Solon v. Hrivnak*, 2014-Ohio-3135, ¶ 18 (8th Dist.), citing *State v. Clark*, 2007-Ohio-3777, ¶ 13 (8th Dist.), *State v. Simms*, 2008-Ohio-4848, ¶ 6 (9th Dist.), and *State v. Holland*, 1999 Ohio App. LEXIS 6143 (11th Dist. Dec. 17, 1999). "'Generally, any lay witness, including a police officer, may testify whether an individual appeared intoxicated.'" *Cleveland v. Clark*, 2024-Ohio-4491, ¶ 41 (8th Dist.), quoting *Clark*, citing *State v. Schmitt*, 2004-Ohio-37, ¶ 12, citing *Columbus v. Mullins*, 162 Ohio St. 419, 421 (1954). "'Other factors that the [S]tate may use to show intoxication include evidence that the defendant caused an accident, refused to submit to a field-sobriety or chemical test, or exhibited a belligerent or combative demeanor.'" *Clark* at ¶ 41, quoting *State v. Yared Fitsum Assefa*, 2023-Ohio-385, ¶ 20 (1st Dist.). "'Field-sobriety tests are not required to prove an OVI conviction.'" *Id.*, quoting *Hrivnak* at ¶ 17, citing *State v. Strebler*, 2006-Ohio-5711, ¶ 17 (9th Dist.).

{¶ 50} Patrolman Bolivar testified that he did not conduct SFSTs at the accident scene because it was too hectic. He further testified that Soto refused to

submit to a blood alcohol test or urine screen at the hospital. Absent test results on Soto's alcohol consumption, the State presented evidence of Soto's physiological characteristics following the accident. Patrolman Bolivar testified that he smelled alcohol on Soto and noticed he had glassy, red eyes. Patrolman Bolivar did not observe Soto using slurred speech. EMS worker Hyde testified that Soto smelled of alcohol, had glassy eyes, and delayed responses to Hyde's questions that indicated he had been drinking. Additionally, Soto admitted to Hyde that he had consumed three drinks, and Hyde believed Soto was referring to alcoholic beverages. Schneider testified that based upon his years of living with an alcoholic father, and Soto's behavior, he could discern that Soto was intoxicated.

{¶ 51} H.P. testified that she drank a shot with Soto at the club. H.P. also testified that after leaving the club and before the automobile accident, Soto drove "aggressively" and like a "maniac." The evidence further established that Soto crashed into Rios's vehicle when he attempted to pass her on the left; Soto was driving 94 miles per hour in a 35 miles per hour zone and he did not apply his brakes prior to impact.

{¶ 52} When viewing this evidence in a light most favorable to the State, any rational trier of fact could have found Soto was impaired and driving under the influence. While the State did not introduce either a SFST or chemical test demonstrating Soto was intoxicated, the record contains sufficient testimony of Soto's alleged intoxication. Thus, the trial court did not err when it denied Soto's Crim.R. 29 motion on the issue of OVI.

**(b) Recklessness**

{¶ 53} Soto next contends that the trial court erred when it denied his Crim.R. 29 motion on Counts 2, 5, and 6 that require a finding of recklessness. Specifically, Soto argues that the evidence was insufficient to show that he recklessly caused harm to Rios and H.P. He claims that driving over the speed limit, even if coupled with driving over a solid lane marker, constituted negligence not recklessness.

{¶ 54} Because Counts 2, 5, and 6 — that required a showing of recklessness — merged for purposes of sentencing, we need not address this issue. Counts 2 and 5 were sentenced under Count 1, and Count 6 was sentenced under Count 4. A finding of recklessness was not required to prove Count 1, involuntary manslaughter, Count 1's predicate offense of aggravated vehicular assault, OVI— the predicate offense for aggravated vehicular assault — or Count 4, a second charge of aggravated vehicular assault. Thus, we find that a sufficiency-of-the-evidence analysis related to recklessness is not necessary because any error would constitute harmless error. *See* above Section II (B)(1), merger.

{¶ 55} For the foregoing reasons, Soto's third assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 56} In his second assignment of error, Soto argues that his OVI convictions and findings of recklessness were against the manifest weight of the evidence.

### 1. Standard of Review

{¶ 57} A manifest-weight challenge questions the credibility of the evidence presented and examines whether the State met its burden of persuasion at trial. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins*, 1997-Ohio-52 at ¶ 24; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins* at ¶ 33.

{¶ 58} "'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief."'" (Emphasis omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins* at ¶ 24, quoting *Black's Law Dictionary* (6th Ed. 1990). A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree with

the factfinder's resolution of the conflicting testimony. *Thompkins* at ¶ 25, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which evidence weighs heavily against conviction.'" *State v. Crenshaw*, 2020-Ohio-4922, ¶ 24 (8th Dist.), quoting *Thompkins* at ¶ 25.

**2. Analysis**

{¶ 59} In Soto's second assignment of error, he argues that his OVI convictions were against the manifest weight of the evidence. Specifically, Soto argues that there were no SFSTs or chemical tests to demonstrate he was under the influence of alcohol and that the only evidence was the testimony of the State's witnesses who were not credible. Soto appears to find the State's witnesses lacked credibility because some of their testimony was inconsistent. For instance, Soto claims that Patrolman Bolivar testified to Soto's glassy, red eyes but denied Soto slurred his speech whereas Hyde testified that Soto exhibited slurred speech and glassy eyes. Additionally, Schneider stated Soto tried to borrow bystanders' keys so that he could flee the accident scene, but this testimony was not corroborated by any other witness or by the video-camera recording played at trial. Soto also contends that Patrolman Bolivar's body-camera footage did not show him unsteady on his feet, slurring his speech, or exhibiting bloodshot or glassy eyes. Therefore, Soto contends there was not credible evidence to find he was under the influence of alcohol while operating his vehicle.

{¶ 60} ""[C]ircumstantial evidence and direct evidence inherently possess the same probative value."" *Cleveland v. Imrie*, 2021-Ohio-308, ¶ 18 (8th Dist.), quoting *State v. Hartman*, 2008-Ohio-3683, ¶ 37 (8th Dist.), quoting *Jenks*, 61 Ohio St.3d 259 (1991), at paragraph one of the syllabus. "Accordingly, the State was not obligated to produce direct evidence that [Soto was driving while under the influence of alcohol]; circumstantial evidence permitting an inference of the same was all that was required." *State v. Pettaway*, 2025-Ohio-1181, ¶ 24 (8th Dist.).

{¶ 61} Further, a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial. *State v. Medley,* 2018-Ohio-1391, ¶ 20 (8th Dist.), citing *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). The jury "is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Maldonado*, 2020-Ohio-5616, ¶ 40 (8th Dist.), citing *State v. Ellis*, 2013-Ohio-1184, ¶ 18 (8th Dist.). And a conviction is not against the manifest weight of the evidence simply because the factfinder believed the prosecution's witness. *State v. Wherry*, 2026 Ohio App. LEXIS 1296, *5 (1st Dist. Apr. 8, 2026) citing *State v. Brown*, 2025-Ohio-2351, ¶ 18 (1st Dist.).

{¶ 62} As discussed above, the State presented evidence — including the testimony of Patrolman Bolivar, Hyde, Schneider, H.P., and Detective Moten — that Soto was under the influence of alcohol. After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the witnesses' credibility and deferring to the trier of fact's credibility assessment, we are unable to conclude that

the jury lost its way and created a manifest injustice.  This is not an exceptional case in which the evidence weighs heavily against conviction.

{¶ 63} For these reasons, Soto's second assignment of error is overruled.[2]

## D. Jury Instruction

{¶ 64} Soto contends in his fourth assignment of error that the trial court abused-its-discretion when it instructed the jury on Soto's refusal to submit to chemical testing.

{¶ 65} A trial court's decision to provide a specific jury instruction is within the sound discretion of the court, and such a decision will be reviewed under an abuse-of-discretion standard.  *Robinson v. Turoczy Bonding Co.*, 2016-Ohio-7397, ¶ 28 (8th Dist.), citing *Sicklesmith v. Hoist*, 2006-Ohio-6137, ¶ 62 (7th Dist.).

{¶ 66} "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991).

{¶ 67} Here, the trial court provided the following instruction to the jury:

> Refusal to submit to test.  Evidence has been introduced indicating the defendant was asked but refused to submit to a chemical test of his blood and/or urine to determine the amount of alcohol, drug of

---

[2] Soto also argued that the jury's finding of recklessness was against the manifest weight of the evidence.  As stated previously, a finding of recklessness was not required to prove the counts upon which Soto was sentenced — Count 1 and its predicate offenses or Count 4 — and, accordingly, a manifest-weight-of-the-evidence analysis related to recklessness is unnecessary because any error would constitute harmless error.  *See* above Section II (B)(1), merger.

abuse and/or alcohol and a drug of abuse in his system for the purpose of suggesting that the defendant believed he was under the influence of alcohol, drug of abuse and/or alcohol and a drug of abuse.

If you find the defendant refused to submit to said test, you may, but are not required to, consider this evidence along with all the other facts and circumstances in evidence in deciding whether the defendant was under the influence of alcohol, drug of abuse and/or alcohol and a drug of abuse.

Tr. 777-778.

{¶ 68} The Ohio Supreme Court has stated that it is "permissible for a trial judge to instruct a jury that the defendant's refusal to submit to a chemical test is evidence of his or her intoxication at the time of the taking of the test." *Maumee v. Anistik*, 1994-Ohio-157, ¶ 14. The *Anistik* Court stated that after an individual has been arrested for suspected OVI and is requested by a police officer to submit to a chemical test and he or she refuses to take the test, courts may instruct the jury as the trial court did in this matter. *Id.* at ¶ 16. The "refusal to submit" jury instruction provides juries with a degree of neutrality and allows them "to consider the totality of the circumstances involving a defendant's choice to decline testing." *Parma v. Benedict*, 2015-Ohio-3340, ¶ 37 (8th Dist.), citing *Anistik* at ¶ 16.

{¶ 69} Patrolman Bolivar testified that he handcuffed Soto to the gurney while Soto was treated at the accident scene by the EMS vehicle. Patrolman Bolivar also testified that after Soto was transported to MetroHealth Hospital, the officer followed a BMV checklist utilized after an individual is charged with an OVI offense and asked whether Soto would submit to a urine or blood test. According to Patrolman Bolivar, Soto refused to submit to either test.

{¶ 70} Here, the court's "refuse to submit" jury instruction conformed with the instruction sanctioned by the Ohio Supreme Court in *Anistik*. We cannot say that the trial court abused its discretion in instructing the jury on the element of refusal and, accordingly, Soto's fourth assignment of error is overruled.

{¶ 71} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIMOTHY W. CLARY, JUDGE

LISA B. FORBES, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR